269 F.3d 1042 (9th Cir. 2001)
 NICANOR E. CASUMPANG, JR., PLAINTIFF-APPELLANT,
v.
INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION, LOCAL 142, DEFENDANT,
AND
JOHN DOES 1-10; INTERNATIONAL LONGSHORE & WAREHOUSE UNION, LOCAL 142; EUSEBIO LAPENIA, JR., DEFENDANTS-APPELLEES.
 No. 99-16674
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued February 15, 2001
Submission deferred February 15, 2001
Submitted March 9, 2001
Filed October 23, 2001
 
 [Copyrighted Material Omitted]
 Shawn Anthony Luis (argued), Honolulu, Hawaii, for the plaintiff-appellant. Herbert R. Takahashi, Honolulu, Hawaii; Fred H. Altshuler (argued), Altshuler, Berzon, Nussbaum, Berzon & Rubin, San Francisco, California, for the defendants-appellees.
 Appeal from the United States District Court for the District of Hawaii; Alan C. Kay, District Judge, Presiding. D.C. No. CV-98-00775-ACK
 Before: Alarcon, Kozinski, and Hawkins, Circuit Judges.
 Alarcon, Circuit Judge:
 
 
 1
 Nicanor E. Casumpang, Jr. appeals from the dismissal of this action. The district court concluded that it lacked subject matter jurisdiction pursuant to Title IV of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. &#167 &#167 481-83 (2000), over his second amended complaint and, alternatively, on the basis that "[e]ven if the Court found that Plaintiff's Second Amended Complaint substantively involved Title I rights rather than Title IV rights, which it does not, the Court would still dismiss the complaint because Plaintiff failed to exhaust internal union procedures in a timely fashion."
 
 
 2
 We reverse the dismissal of this action because we conclude that the district court erred in determining that it lacked subject matter jurisdiction over the second amended complaint. We also vacate the dismissal of the second amended complaint because the district court erroneously determined that Casumpang was required to exhaust union hearing procedures before filing his Title I claim in the district court.
 
 PART ONE
 
 3
 I. The Cease-and-Desist Outside Gainful Employment Order
 
 
 4
 Casumpang has been a member of the International Longshore and Warehouse Union ("ILWU") since July 22, 1981. On April 2, 1996, Casumpang was employed full-time as an elected business agent of Local 142 of the ILWU. Members of the Local Executive Board filed written charges against him on that date, alleging he had violated Article II, &#167 1 of the Local's constitution.[1] The matter was set for trial on April 16, 1996 before the Maui Division Trial Committee. Before then, Casumpang, officers of the Local, and Roger Tacdol, the ILWU Maui Division Director, entered into a stipulation concerning the facts and waived their right to a trial.
 
 
 5
 The parties stipulated as follows: Casumpang was an elected full-time official on the Local's payroll. While an employee, Casumpang had performed services as a licensed electrical contractor without authorization of the Executive Committee or approval of the Local Executive Board. Casumpang also agreed not to seek an appeal from the determination of the Maui Division Trial Committee, or file any action against the Local or its agents or officers because of the charges brought against him.
 
 
 6
 Based on the stipulated facts, the Maui Division Trial Committee found Casumpang guilty of violating Article II, &#167 1 of the Local's constitution. Casumpang was ordered to cease working as an electrical contractor and to seek prior authorization before engaging in any further business as an electrical contractor. On April 22, 1996, Casumpang applied to the Local Executive Board for authorization to conduct an electrical contracting business. His request was denied on June 4, 1996.
 
 II.
 
 7
 A. The Challenged November 1997 Ballot Count
 
 
 8
 The Local elects officers every three years as required by &#167 401(b) of the LMRDA, 29 U.S.C. &#167 481(b).[2] Casumpang was nominated for the position of Maui Division Director on September 8, 1997. His opponent was Rogelio "Roger" Tacdol. Casumpang won the election with 2017 votes, to Tacdol's 1999. Tacdol appealed the results, listing four irregularities in the counting of challenged ballots. The Local appointed an Election Investigating Committee to examine these challenges.
 
 
 9
 Tacdol submitted a supplemental challenge to the election results about a week later. In addition to the four grounds he previously asserted, Tacdol alleged that Casumpang violated the Local Election Code by campaigning while on duty as a business agent, and placing campaign literature on the windshields of cars in the employees' parking lots at three hotels in Maui.
 
 
 10
 The Election Investigating Committee found that the Maui Division Balloting Committee had "improperly opened, counted and commingled 115 challenged ballots." It also found that Casumpang had campaigned on "paid time," and that fliers advertising Casumpang's candidacy were left on cars on hotel property. The Election Investigating Committee recommended that the election results be set aside and that the Local Executive Board direct that a new election be conducted.
 
 
 11
 The Local Executive Board sustained Tacdol's challenge to the election based on the findings of the Election Investigating Committee, and ordered a new election within forty-five days.
 
 
 12
 On January 16, 1998, Casumpang filed an appeal with Brian McWilliams, President of the ILWU, from the Local Executive Board's decision. Casumpang alleged that Tacdol had "handpicked" a majority of the members of the Maui Division Balloting Committee including a relative, Frances Pagay, and others who had campaigned for his election. Casumpang argued that the evidence presented to the Election Investigating Committee was insufficient to demonstrate that the procedures followed in counting the ballots affected the outcome of the election. Casumpang asserted that"the Election Investigating Committee's hearing was `fixed,' and a complaint has been filed with the U.S. Department of Labor." Finally, Casumpang maintained in his January 16, 1998 appeal that a re-election should not have been ordered because his margin of victory would have been greater but for serious violations of the Local's election procedures by the Balloting Committee.
 
 
 13
 B. The Loss of Good Standing Membership Privileges
 
 
 14
 Within a week of the Executive Board's ordering a new election, the officers of the Local requested that Casumpang provide information regarding whether he had continued to work as an electrical contractor after his request for authorization to do so was denied.
 
 
 15
 Casumpang objected to the timing and fairness of the investigation and accused the officers of the Local of "an attempt to selectively prosecute me as a result of my election to the office of Division Director." Casumpang denied that he had been gainfully employed as an electrical contractor since June 4, 1996.
 
 
 16
 The Secretary-Treasurer of the Local notified Casumpang in writing that "you may not be eligible for the union office to which you have been nominated" because a doubt had been raised regarding whether Casumpang had been gainfully employed in violation of Article II, &#167 2.01 of the Local's constitution, as amended in 1997. Two days later, thirteen members of the Local filed written charges accusing Casumpang of performing work as an electrical contractor. He was also charged with filing electrical permit applications with the Department of Public Works, County of Maui, a violation of the Maui Trial Division's order.
 
 
 17
 Casumpang filed a written response to the charges before his hearing. He contended, among other things, that he had not been properly served with notice of his possible ineligibility for office until the last day for the filing of a response. He complained that "[t]his intentional and unprofessional tactic is but another in a long string of attempts to prevent me from assuming the post [to] which I have been duly elected by the membership of the Maui Division of the ILWU." Casumpang argued that Article II of the Local's constitution was invalid because it had not been properly ratified by the Local's membership. He also said that he had not been gainfully employed as an electrical contractor since June 4, 1996. He admitted that he had filed for electrical permits as favors to friends, without receiving compensation.
 
 
 18
 The Judicial Panel conducted a hearing on January 16, 1998 to consider evidence concerning charges filed on January 7, 1998. On January 17, 1998, the Judicial Panel rendered its decision. It found that Casumpang had "knowingly and deliberately violated Article II, Section 1 of the[Local's] Constitution on or about June 14, 1996, July 16, 1996, August 20, 1996, October 22, 1996, June 2, 1997, July 30, 1997, August 6, 1997, October 13, 1997, and October 27, 1997."
 
 The Judicial Panel ordered as follows:
 
 19
 1. Effective June 14, 1996[,] Casumpang is suspended as a member in good standing of ILWU Local 142 for a period of nine (9) consecutive years.
 
 
 20
 2. During the period of his suspension as a member in good standing of ILWU Local 142 (a period of 9 years) Casumpang shall neither be eligible for nomination [to], nor serve as[,] an officer of ILWU Local 142 or as an officer or steward of any of the units of ILWU Local 142.
 
 
 21
 3. Effective January 7, 1998, Casumpang shall receive no further compensation as a business agent and Casumpang is hereby ordered to turn in all union office keys and all papers and property of the union on January 19, 1998 at 12:00 noon to the Secretary [-] Treasurer of the union, or his designee.
 
 
 22
 4. Effective the date of this Decision and Order and continuing up to June 14, 2005[,] Casumpang shall not be permitted to serve in any appointed full-time position in ILWU Local 142.
 
 
 23
 5. Within 60 days of the date of this Decision and Order Casumpang shall pay a fine of $7,636 to ILWU Local 142.
 
 
 24
 The Judicial Panel notified Casumpang that he had a right to appeal from its decision to the Local Executive Board within fifteen days. Casumpang was also informed that Rule 27 of the Financial Code of ILWU Local 142 required him to exhaust internal union remedies before seeking recourse outside the union.
 
 
 25
 Casumpang appealed this decision before the Local Executive Board. He argued that the Judicial Panel had not been properly constituted and had no jurisdiction because the proposed amendments to the Local's constitution had not been ratified by the union membership. He argued that Article II, &#167 1 of the Local's constitution was ambiguous and ill-defined and had been misconstrued and misapplied by the Judicial Panel. Casumpang also maintained that he had been deprived of a full and fair hearing before the Judicial Panel.
 
 
 26
 The Local Executive Board rejected Casumpang's appeal. The Local Executive Board determined that the Judicial Panel had been properly constituted and that there was clear and convincing evidence that Casumpang had violated the cease-and-desist order. It also concluded that the "punishment" meted out by the Judicial Panel was fair and reasonable.
 
 
 27
 Casumpang filed an appeal from the Local Executive Board with McWilliams. Casumpang requested that the decision of the Judicial Panel be declared void because it violated the Local's constitution and bylaws. He also argued that the penalty he had received was arbitrary and capricious. Casumpang said that he had performed outside electrical work with the permission of the Local's president, Eusebio Lapenia, Jr. He claimed that the Local leadership had concealed this information from the Judicial Panel.
 
 
 28
 McWilliams dismissed Casumpang's appeal on procedural grounds. Specifically, McWilliams stated that Casumpang had failed to appeal the decisions of the Judicial Panel and the Local Executive Board to the Local's membership pursuant to &#167 27.10.5 of the Local's constitution.[3] In a footnote, McWilliams stated: "A decision on the merits of Brother Casumpang's appeal would have resulted in it[s] being denied as he failed to prove that there were procedural errors in the manner in which Local 142 handled the complaint against him."
 
 
 29
 On August 14, 1998, Casumpang wrote McWilliams notifying him that he was appealing the July 1, 1998 dismissal of his April 18, 1998 appeal to the International Executive Board on two grounds. Casumpang argued that the question whether he was required to appeal to the local membership had not been raised by the Local in response to his previous appeals to the ILWU. He also argued that his appeal complied with the amended text of Article XXVII of the Local's constitution. As amended, it read:
 
 
 30
 Any accused wishing to appeal the action of the Judicial Panel must do so in writing within fifteen (15) days after being notified by the Chair of the Judicial Panel. The appeal must be in writing and shall be made to the Local Executive Board. The decision of the Local Executive Board shall be final. In all cases, however, the decision of the lower tribunal must be complied with before the right to appeal can be accepted by the next tribunal in authority and shall remain in effect until reversed or modified. All appeals must be exhausted before resorting to [the] courts.
 
 
 31
 Local 142 Constitution &#167 27.13 (1997).
 
 
 32
 Casumpang wrote to the President of Local 142 on August 25, 1998, requesting permission to appeal to the local union's membership. His request was rejected for failure to exhaust internal union remedies. One week later, McWilliams informed Casumpang that his appeal to the International Executive Board was rejected as untimely pursuant to Article IX, &#167 5 of the ILWU Constitution because it had been filed more than thirty days after McWilliams's decision.
 
 
 33
 In a letter signed by the Local's president, Casumpang's appeal to the Local membership was denied for failure to exhaust internal union remedies. The letter states that "[i]n election matters of this nature, the [S]secretary of [L]abor has exclusive jurisdiction, provided a timely appeal has been filed under 29 U.S.C. [&#167] 482(a)."
 
 C. The Re-run Election
 
 34
 One day after the Local Executive Board had ordered a new election for the position of Maui Division Director, the Local's Secretary-Treasurer notified Casumpang in writing that he was ineligible to serve as a candidate for union office because he had not been a member in good standing for a period of two consecutive years prior to nomination. He was also informed that his name would not appear on the ballot in the upcoming re-election for Maui Division Director. The notice closed with the following admonition: "If you disagree with this determination, please be aware of the requirements of exhaustion of internal union remedies under Rule[ ]27 of the Financial Code."
 
 
 35
 In January 1998, the Local held a re-run election. Tacdol was elected unopposed for the office of Division Director. The election results were announced on February 10, 1998.
 
 
 36
 In a letter dated March 10, 1998, McWilliams denied Casumpang's January 16, 1998 appeal challenging the decisions of the Election Investigating Committee and the Local Executive Board which set aside the results of the earlier election. McWilliams found that the Local followed its constitution, bylaws, and rules in addressing the challenges to the November 1997 election. He noted that under the ILWU's Constitution he could not rehear the evidence or substitute his judgment in place of that of the Election Investigating Committee.
 
 
 37
 Casumpang filed a complaint with the Department of Labor on October 9, 1998, alleging that violations of the LMRDA had occurred in the election of officers in the November 26, 1997 election, and in the rerun of that election conducted on January 30, 1998. On April 11, 1999, Lary F. Yud, the Chief of the Division of Enforcement of the Department of Labor, informed McWilliams that the Department of Labor had determined that "legal action is not warranted in this case." The Statement of Reasons accompanying the letter from Yud concludes: "[T]he complainant did not file a complaint with the Department of Labor within one calendar month of either exhausting available internal union remedies or within one calendar month of invoking available internal remedies without obtaining a final decision within three calendar months."
 
 PART TWO
 I. The Title I Freedom of Speech Claim
 
 38
 On September 23, 1998, Casumpang filed this action in the district court pursuant to &#167 102 of the LMRDA, 29 U.S.C. &#167 412,[4] against Local 142, its president, Eusebio Lapenia, Jr., and ten John Does (collectively, the "Local"). He alleged in his complaint that the Local removed him "from his elected position as Business Agent and suspended his membership . . . in retaliation for his exercise of his free-speech activity" contrary to the protection guaranteed to union members by Title I of the LMRDA &#167 &#167 101(a)(1), (2), 29 U.S.C. &#167 &#167 411(a)(1), (2).[5]
 
 
 39
 Casumpang requested the following relief from the court:
 
 
 40
 1. Issue a declaratory judgment that Defendants' conduct complained herein violated Section 101(a)(1) of the Labor Management Reporting and Disclosure Act, 29 U.S.C. [&#167] 411(a)(1).
 
 
 41
 2. Order Defendants to make Plaintiff whole by reinstating him to his former position with Local 142, providing the appropriate back pay and reimbursement for lost pension and other benefits and expenses in an amount to be shown at trial; or in the alternative, order Defendants and each of them jointly and severally, to pay Plaintiff the present value of his future lost earnings in an amount to be shown at trial.
 
 
 42
 3. Order Defendants to make Plaintiff whole by reinstating him as a member of Local 142 with all privileges accompanying such membership.
 
 
 43
 Casumpang also prayed for compensatory damages of not less than $100,000 and punitive damages or exemplary damages, plus attorney's fees and costs.
 
 
 44
 On October 19, 1998, Casumpang filed his first amended complaint. It is identical to the original complaint except that the surname of the president of Local 142 (Eusebio Lapenia, Jr.) is spelled correctly. Casumpang filed his second amended complaint on June 4, 1999. Casumpang alleged that he was "deprived of his membership with Local 142[ ] with all the privileges that accompanied such membership" as a direct and proximate result of the Local's retaliation "for Plaintiff's exercise of his free-speech activity as a union member under 29 U.S.C. [&#167] 411."In the second amended complaint, Casumpang alleged specific facts to support his claim that his status as a member in good standing was taken away in retaliation for his criticism of the leadership of Local 142. Casumpang first alleged that in 1995 he expressed his disagreement with the leaders of Local 142 regarding their resolution of a dispute with Monarch Building Supply in Maui. After approximately four months of informational picketing by union members, Casumpang learned that Monarch Building Supply had offered to settle the matter for $50,000. Local leaders instructed Casumpang to accept $13,500. Casumpang questioned the leadership of Local 142 about the remaining amount. He refused to accept the lesser amount without consulting the pickets. The leadership of the Local, however, accepted the $13,500 offer without consulting the union members.
 
 
 45
 Second, Casumpang alleged that in that same year, he advised Lapenia during the course of negotiating several master agreements with hotels, including five hotels in Maui, that the hotels were willing to offer a two percent wage increase each year for three years if their master agreement was extended. The leaders of the Local refused the offer. As a result, the master agreement was not renewed. The hotels stopped collecting union dues, and the employees of these hotels were without a collective bargaining agreement for eighteen to twenty-four months. Casumpang alleges he criticized the decision of the Local leadership not to accept the hotels' offer, and criticized the use of attorneys in the negotiations with the hotels. Previously, attorneys had not participated in contract negotiations. Further, Casumpang expressed his objection to the memorandum of agreement Lapenia negotiated with the Kaanapali Beach Hotel because it resulted in a decrease in the employer's contribution to the members' pension plan, the loss of meal benefits, and the failure to include the payment of a wage increase deferred in 1994.
 
 
 46
 Finally, Casumpang alleged that, at a meeting attended by Lapenia, he objected to Lapenia's withholding of approximately $500,000 of union members' deferred wage increases for the establishment of a health and welfare fund. When union members learned of Lapenia's withholding of funds, they threatened to sue the Local and its officers. As a result of these threats, the Local abandoned the plan for the creation of the health and welfare fund. Casumpang alleged that he reiterated his criticisms of Local leaders at the Local 142 convention in September, 1997. Approximately three months after the 1997 convention, the Local requested that Casumpang supply information regarding his electrical contracting business.
 
 
 47
 In the second amended complaint, Casumpang deleted the allegation present in his first two complaints that"Defendants had removed him from his elected position as Business Agent." Instead, the second amended complaint merely asserts that "Plaintiff has been deprived of his membership with Local 142, with all the privileges that accompanied such membership." In his prayer for relief, Casumpang also omitted his previous request that the court order "Defendants to make Plaintiff whole by reinstating him to his former position with Local 142" with back pay and reimbursement for lost pension and other benefits. Instead, the prayer in the second amended complaint reads as follows:
 
 
 48
 Wherefore, Plaintiff respectfully prays that this Court:
 
 
 49
 1. Issue a declaratory judgment that Defendants' conduct complained herein violated Section 101(a)(1) and (2) of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. Sec. 411(a)(1) and (2).
 
 
 50
 2. Order Defendants to make Plaintiff whole by reinstating him as a member of Local 142 with all the privileges accompanying such membership.
 
 
 51
 3. Enter judgment in favor of Plaintiff and against Defendants, jointly and severally, for compensatory damages, in an amount to be determined at trial, not less than $100,000.
 
 
 52
 4. Enter judgment in favor of Plaintiff and against Defendants, jointly and severally, for punitive or exemplary damages, to be determined at trial.
 
 
 53
 5. Grant Plaintiff reasonable attorney's fees and costs.
 
 
 54
 6. Grant such other and additional relief as may this Court seem proper [sic].
 
 II. The Dismissal Proceedings
 A. The Local's Motion to Dismiss
 
 55
 The Local filed a motion to dismiss Casumpang's complaint before he filed his second amended complaint. The Local asserted that the district court lacked subject matter jurisdiction. Specifically, the Local argued that a"post election challenge of this nature relating to the eligibility of a candidate is a claim arising under Title IV of the LMRDA which falls within the exclusive jurisdiction of the Secretary of Labor under 29 U.S.C. &#167 482, &#167 483."
 
 
 56
 On May 26, 1999, Casumpang filed a memorandum opposing the motion. Casumpang asserted that his purpose in filing the second amended complaint was to eliminate any claims under Title IV.[6] He argued that he was "not seeking reinstatement . . . as an elected official, but only as a union member." He further maintained that he did not "attempt to reverse any elections" in the relief requested in the second amended complaint. Casumpang asserted that his cause of action for restoration of his membership right to vote and participate in union decisions was protected under Title I.[7]
 
 
 57
 The Local filed a reply brief, contending that the second amended complaint sought an order restoring Casumpang to the status of a "member in good standing." It argued that "Casumpang's suspension as a `member in good standing' affects only his right to serve in union office." Thus, the Local maintained, Casumpang's federal action "is in reality a challenge to the results of the February 10, 1998 election for the five business agent positions on Maui won by Bazarin, DeMello, Franco, Kennison, and Viernes." The Local asserted that "[s]uch a claim is cognizable only through a post election challenge of the 1998 Maui business agent contest " under Title IV. The Local renewed its request that the court dismiss Casumpang's complaint for lack of jurisdiction over a Title IV action challenging an election already conducted.
 
 
 58
 B. The Court Proceedings on the Motion to Dismiss
 
 
 59
 The district court heard arguments from counsel on the Local's motion to dismiss on June 16, 1999. No oral testimony was presented.
 
 
 60
 The Local argued that dismissal of this action was required because Casumpang had failed to demonstrate the existence of a factual and legal basis to support subject matter jurisdiction over his claim. Their contentions can be summarized as follows:
 
 
 61
 1. Engaging in work as an electrical contractor is not a protected activity.
 
 
 62
 2. Casumpang failed to allege facts to support a claim under Title I because he failed to challenge the Local's determination that while serving as a business agent, he had also been gainfully employed as an electrical contractor in violation of Article II, &#167 1 of the Local's constitution.
 
 
 63
 3. The civil rights protections set forth in Title I solely apply to union members. They do not apply to business agents.
 
 
 64
 4. A challenge to the deprivation of a union member's good standing status can only be asserted under Title IV. Thus, Casumpang "cannot bring a Title I case to have a court determine that [he is] a member in good standing."
 
 
 65
 5. Casumpang's prayer for $100,000 in compensatory damages demonstrates that he is contesting the results of the February 10, 1998 rerun election for the office of Business Agent.
 
 
 66
 Casumpang made the following points in response to the motion to dismiss:
 
 
 67
 1. The second amended complaint "excised all allegations relating to a[n] election and added allegations that were specific as to Mr. Casumpang's . . . exercise of his First Amendment rights."
 
 
 68
 2. "[T]he second amended complaint does not seek to undo the election."
 
 
 69
 3. The second amended complaint does not request back pay for Casumpang's work as business agent or as Maui Division Director.
 
 
 70
 4. The suspension of his good standing status deprived Casumpang of his right to participate in the union's meetings and vote in elections.
 
 
 71
 5. The suspension of Casumpang's good member status for his employment as an electrical contractor was pretextual. He was disciplined in retaliation for expressing his views on behalf of his fellow union members.
 
 
 72
 6. The prayer for relief does not ask the court to invalidate the 1998 election "because we feel that that is totally within the purview of the Secretary of Labor under Title IV."
 
 
 73
 7. In its motion to dismiss, the Local did not dispute the facts set forth in the second amended complaint regarding Casumpang's critical comments about the Local leadership's improper conduct.
 
 C. The Judgment
 
 74
 The district court granted the Local's motion to dismiss this action for lack of subject matter jurisdiction. The court reasoned as follows:
 
 
 75
 [A]lthough Plaintiff no longer wishes to overturn the results of the [1998] rerun election, a course that would certainly run afoul of Title IV, the court finds that the substance of Plaintiff's complaint still involves Title IV because it revolves around over-turning the union's decision to suspend him as a member in good standing and effectively means reinstating his eligibility to hold union office. This relief -- having the Court reinstate him as a member in good standing -- would implicitly impact the 1998 rerun election results because it would be akin to having the Court declare that Plaintiff was improperly barred from running in that election, which determination is the exclusive province of the Secretary of Labor. See 29 U.S.C. &#167 483.
 
 
 76
 The district court also made the following observation:
 
 
 77
 Even if the Court found that Plaintiff's Second Amended Complaint substantively involved Title I rights rather than Title IV rights, which it does not, the Court would still dismiss the complaint because Plaintiff failed to exhaust internal union procedures in a timely fashion. Plaintiff correctly points out that determining whether a union member must first exhaust internal remedies is a matter of judicial discretion.
 
 
 78
 (emphasis added). In rejecting Casumpang's assertion that the pursuit of internal remedies would be futile, the district court stated: "The Court disagrees with Plaintiff's argument and finds that, in the exercise of judicial discretion, the failure to utilize available internal remedies to protest the alleged violations of Title I is an alternative reason justifying dismissal."
 
 
 79
 Finally, the district court said that "[e]ven if the Court construed Plaintiff's Title IV appeal to the Secretary of Labor as also involving Title I, the Secretary of Labor's determination that Plaintiff failed to exhaust internal union remedies in a timely fashion with regard to Plaintiff's Title IV claims would also apply to Plaintiff's Title I claims." In footnote 10 of its order, the district court noted that "[i]n its Statement of Reasons, the Department of Labor expressly stated that it did not consider the issue of whether Plaintiff's rights under Title I were violated by the suspension." (emphasis added).
 
 PART THREE
 Discussion
 I.
 
 80
 The district court concluded that it lacked subject matter jurisdiction because the thrust of Casumpang's complaint fell under Title IV rather than Title I of the LMRDA. The court also concluded that it lacked jurisdiction because Casumpang's complaint did not arise under Title I. We review de novo a district court's dismissal for lack of subject matter jurisdiction. Seven Resorts, Inc. v. Cantlen, 57 F.3d 771, 772 (9th Cir. 1995). Any factual determinations made by the district court in ruling on a motion to dismiss are reviewed for clear error. Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A., 20 F.3d 987, 990 (9th Cir. 1994).
 
 
 81
 Casumpang first contends that the district court erred in concluding that it lacked subject matter jurisdiction because Title IV governed his complaint. Casumpang maintains that his claim arose under Title I and that the district court therefore possessed subject matter jurisdiction. The Local counters that Casumpang lacks standing to bring a claim under Title I. The Local also contends that Casumpang's claim does not arise under Title I because he has failed to demonstrate a causal connection between his criticism of the Local leadership and the suspension of his membership in good standing. Finally, the Local argues that Casumpang presented insufficient evidence to rebut the affidavits it offered in support of its contention that Casumpang was stripped of his membership for violating Article II, &#167 1 of the Local's constitution. We address each of these arguments below.
 
 A. Standing
 
 82
 We first address the question of standing because it "is part of the common understanding of what it takes to make a justiciable case." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102 (1998). The Local contends that Casumpang lacks standing to prosecute a claim under Title I because his criticisms of the actions of Local leaders "arose in connection with Casumpang's role as a business agent, and not as a union member." No citation was set forth in the Local's brief to support this contention. We assume the Local is relying on the principle that a plaintiff's interest must be "arguably within the zone of interests to be protected" by a federal statute in order to satisfy the prudential component of standing. Associated Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970).
 
 
 83
 Guy Fujimura, the Secretary-Treasurer of the Local, asserted in an affidavit that the suspension of Casumpang's membership in good standing did not deprive him of his rights as a union member. Fujimura's affidavit states:"Casumpang's suspension as a `member in good standing' only adversely affected his right to continue to serve as a union officer during the period of his suspension . . . . Casumpang remains a dues paying `member' of the union." Relying on Fujimura's affidavit, the Local maintained before the district court and at oral argument in this appeal that Casumpang cannot come within the zone of interests protected under Title I.
 
 
 84
 The Local conceded at oral argument before us, however, that as a result of the suspension of Casumpang's membership in good standing, Casumpang can no longer participate in certain aspects of union governance. For example, Casumpang cannot nominate candidates for union office. He cannot vote in union elections. He cannot attend union membership meetings. He cannot participate in deliberations or vote on union business. These are precisely the rights protected under Title I of the LMRDA. LMRDA &#167 &#167 101(a)(1), (2), 29 U.S.C. &#167 &#167 411(a)(1), (2). Therefore, we reject the Local's assertion that the suspension of Casumpang's membership in good standing did not strip him of his rights protected under Title I.
 
 
 85
 The undisputed facts alleged in the second amended complaint demonstrate that Casumpang was within the zone of interests protected by Title I, even though he was an elected business agent. In Sheet Metal Workers' Int'l Ass'n v. Lynn, 488 U.S. 347 (1989), the Supreme Court held that the removal by a union trustee of a business agent from his elected office in retaliation for opposing a dues increase at a union meeting violated the free speech provisions of Title I. See id. at 350-55. Casumpang alleged in his second amended complaint that he was removed from his status as a union member in good standing in retaliation for his criticism of the Local's leadership. Under Lynn, Title I protects Casumpang's right to express his views, even though Casumpang was a business agent when he spoke out.
 
 
 86
 B. Impact of Title IV on the District Court's Subject Matter Jurisdiction
 
 
 87
 Casumpang asserts that because his claim against the Local under Title I does not seek to set aside the results of the 1998 rerun election, Title IV does not affect the district court's subject matter jurisdiction over his complaint for damages for the suspension of his status as a member in good standing of the Local. The district court concluded that "the substance of Plaintiff's complaint still involves Title IV because it revolves around overturning the Union's decision to suspend him as a member in good standing and effectively means reinstating his eligibility to hold union office."
 
 
 88
 Under Title IV, "every member[of a labor organization] in good standing shall be eligible to be a candidate" in a union election. LMRDA &#167 401(e), 29 U.S.C.&#167 481(e). A "member . . . may file a complaint with the Secretary [of Labor] . . . alleging the violation" of his or her right to be a candidate in a union election. LMRDA, &#167 402(a), 29 U.S.C. &#167 482(a). Pursuant to Title IV, "[t]he Secretary [of Labor] shall . . . if he finds probable cause to believe that a violation . . . has occurred . . . bring a civil action against the labor organization . . . to set aside the invalid election." LMRDA &#167 402(b), 29 U.S.C. &#167 482(b). A complaint filed with the Secretary of Labor is the exclusive means of resolving disputes governed by Title IV. LMRDA &#167 403, 29 U.S.C.&#167 483.
 
 
 89
 In Local No. 82, Furniture & Piano Moving v. Crowley, 467 U.S. 526 (1984), the Supreme Court held that"the exclusivity provision included in &#167 403 of Title IV plainly bars Title I relief when an individual union member challenges the validity of an election that has already been completed." Id. at 541; LMRDA &#167 403. In footnote 16, however, the Court explained the limited scope of &#167 403. "This does not necessarily mean that &#167 403 forecloses the availability of all postelection relief under Title I. The exclusivity provision of Title IV may not bar postelection relief for Title I claims or other actions that do not directly challenge the validity of an election already conducted." Id. at 541 n.16 (emphasis added).
 
 
 90
 In Crowley, the Court also instructed that:
 
 
 91
 Congress adopted the freedom of speech and assembly provision [&#167 101(a)(2), 29 U.S.C. &#167 411(a)(2)] in order to promote union democracy. It recognized that democracy would be assured only if union members are free to discuss union policies and criticize the leadership without fear of reprisal. Congress also recognized that this freedom is particularly critical, and deserves vigorous protection, in the context of election campaigns. For it is in elections that members can wield their power, and directly express their approval or disapproval of the union leadership.
 
 
 92
 467 U.S. at 537 (alterations in original) (quoting United Steel-workers v. Sadlowski, 457 U.S. 102, 112 (1982) (citations omitted)).
 
 
 93
 In Ross v. IBEW, 513 F.2d 840 (9th Cir. 1975), the plaintiff brought a tort action seeking recovery for damages allegedly inflicted against him by union officials during his campaign for a union position. Id. at 841. We concluded that the plaintiff's claim was not preempted by Title IV because the plaintiff did not "challenge [the election ] or seek any relief which would interfere with operation of the Local pursuant to the election," and the union did not "claim that the Secretary [of Labor acting pursuant to Title IV could] .. . compensate Ross for the harm he claim[ed] to have suffered." Id. at 842-43. We interpreted Congress's intent as follows:
 
 
 94
 [T]he considerations apparently prompting Congress to choose the remedy it chose in . . . preventing the blocking or delaying of elections by actions brought by individual members . . . have nothing to do with, and are not frustrated by, the recovery of monetary damages for election-related torts. We perceive no public purpose to be served by prohibiting all civil actions to that end where challenge to the election is not involved and is not the result.
 
 
 95
 Id. at 843. We held that the operation of Title IV preemption in election-related tort actions turns on two factors: (1) whether the type of relief sought will interfere with the operation of a union pursuant to an already-conducted election, and (2) whether a plaintiff may obtain relief under Title IV for the type of injury he or she claims to have suffered. See id. at 842-43.
 
 
 96
 As interpreted in Crowley and Ross, the impact of Title IV on a union member's right to seek money damages for a deprivation of his or her Title I rights balances"Congress['s] clear[ ] inten[t] to lodge exclusive responsibility for post-election suits challenging the validity of a union election with the Secretary of Labor," Crowley, 467 U.S. at 544, with Congress's competing desire to "guarantee every union member equal rights to vote and otherwise participate in union decisions, free[ ] from unreasonable restrictions on speech and assembly, and proctect[ed] from improper discipline," id. at 536-37. Applying Ross and Crowley to Casumpang's second amended complaint, we must examine it to determine whether he has directly challenged the validity of the rerun election for Maui Division Director. Crowley at 541 n.16; Ross, 513 F.2d at 842-43.
 
 
 97
 In his second amended complaint, Casumpang seeks damages for the Local's alleged violation of his rights under Title I and reinstatement as a member of the Local in good standing. He does not seek reinstatement to the position of Maui Division Director, nor declaratory or injunctive relief related to the validity of the 1998 rerun election. In fact, any claim seeking reinstatement would be moot because the term of office for the candidate elected in the 1998 rerun election for Maui Division Director has expired.[8] Casumpang's Title I claim does not directly challenge the validity of the rerun election for Maui Division Director. The relief he seeks will not interfere with the operation of the Local pursuant to the outcome of the 1998 rerun election.
 
 
 98
 Casumpang could not obtain relief under Title IV for his claim that the Local violated Title I by suspending his membership in good standing in retaliation for his free speech activity. The Local does not argue that the Secretary of Labor can now compensate Casumpang for the harm Casumpang claims he suffered as a result of the Local's alleged violation of Title I. Indeed, the Secretary of Labor has no power to grant relief for violations of Title I. We conclude that Title IV of the LMRDA did not deprive the district court of subject matter jurisdiction over the Title I claim in Casumpang's second amended complaint.
 
 C. Title I Freedom of Speech Claim
 
 99
 The district court also concluded that it lacked subject matter jurisdiction over Casumpang's claim because "Plaintiff has failed to demonstrate any evidence of a relationship between the January 17, 1998 determination of the Judicial Panel and the exercise of any Title I rights. . . . Conversely, the Court finds that Defendants have provided more than adequate evidence to corroborate their contention that the decision to discipline Plaintiff was made in accordance with their powers under Title IV of the LMRDA . . . ." Casumpang argues that this conclusion is erroneous.
 
 
 100
 Section 101(a)(2) of the LMRDA provides, among other things, that "[e]very member of any labor organization shall have the right to . . . express at meetings of the labor organization his views . . . upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of the meetings." To state a cause of action for a violation of &#167 101(a)(2), a union member must allege facts showing that: (1) he or she exercised the right to oppose union policies; (2) he or she was subjected to retaliatory action; and (3) the retaliatory action was "a direct result of his [or her] decision to express disagreement" with the union's leadership. Lynn, 488 U.S. at 354.
 
 
 101
 Casumpang alleged facts in his second amended complaint showing that he had criticized the Local's leadership at union meetings beginning in 1995 and at the union convention in September 1997. The Local does not contest that its leadership had knowledge of Casumpang's criticisms it at the September 1997 convention. It merely alleges that Casumpang expressed his views as a business agent. But, as noted above, a business agent is protected by Title I from disciplinary action for expressing his views about the conduct of the union's affairs. Lynn, 488 U.S. at 350-55. Accordingly, it was not necessary for Casumpang to present evidence that he expressed views critical of the Local leadership in order to establish subject matter jurisdiction.
 
 
 102
 Within three months following Casumpang's protected activity at the union convention, the Local set aside the November 26, 1997 election won by Casumpang and initiated investigations regarding whether Casumpang had worked as an electrical contractor after being ordered not to do so. Casumpang was found guilty of working as an electrical contractor. As punishment, Casumpang was suspended as a member in good standing for a period of nine years. The suspension was made retroactive to January 14, 1996, thereby barring Casumpang from eligibility for the January 1998 rerun election because candidates for Local office must be members in good standing for a period of two years prior to being nominated. These facts satisfy the first two elements of a cause of action for a violation of LMRDA &#167 101(a)(2).
 
 
 103
 The Local argues that Casumpang has failed to demonstrate a causal connection between his criticism of the Local's leadership and the suspension of his status as a member in good standing of the union. In the related field of retaliatory actions by employers under Title VII of the Civil Rights Act of 1964, &#167 704(a) as amended, 42 U.S.C. &#167 2000e-3(a), we have held that a causal link between protected activities and an adverse employment action "may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987). The relationship between a union local and its salaried business agent is closely analogous to the employer-employee relationship under Title VII. As an employee of a union, a business agent is protected from retaliation for his or her free speech activities. Reliance on circumstantial evidence is as necessary to prove a Title I retaliation claim as it is to prove a claim under Title VII. As with discrimination cases, a successful Title I action generally requires a showing of an employer's improper motive and "an employer's true motivations are particularly difficult to ascertain." Miller v. Fairchild Indus., Inc., 797 F.2d 727, 732 (9th Cir. 1986) (citations omitted). It is quite true that there is no direct evidence in the record that the Local suspended Casumpang's status as a member in good standing in retaliation for his critical comments against the Local's leadership. There is sufficient circumstantial evidence in the record, however, to support an inference that the ostensible basis for the suspension articulated by the Local was a mere pretext to mask its retaliatory intent to punish Casumpang for the expression of his views as a union member.
 
 
 104
 For example, prior to December 12, 1997, Article II,&#167 1 of the Local's constitution read as follows:
 
 
 105
 Elected and appointed full time officials of the Local, while on the Local payroll, shall not be permitted to hold any other gainful position unless authorized by the Executive Committee with the approval if the Local Executive Board. Any official who is reported to be so engaged shall be suspended from office forthwith pending an investigation of the facts by the trial committee established under Article XXVI.
 
 
 106
 Article II, &#167 1 was amended on December 12, 1997, however, to read as follows:
 
 
 107
 Elected and appointed full-time officials and Business Agents of the Local and Divisions, while on the Union's payroll, shall not be permitted to hold any other gainful position unless authorized by the Executive Committee with the approval of the Local Executive Board. Gainful position shall not be defined by the profitability of any such venture but rather whether the objective was to earn income or derive some benefit or material gain from said position. Gainful position shall include any monetary or personal interests in any business or other undertaking in which such interest would be in conflict with the duties of the official or employee, the interest of the Union, or to [sic] the programs and activities of the Local. Any official or business agent who is reported to be so engaged shall be suspended from their position forthwith pending an investigation of the facts by the Judicial Panel established under Article XXVIII or be terminated from employment in cases of at will employees.
 
 
 108
 (emphasis added).
 
 
 109
 It is undisputed that this amendment to the Local's constitution was made sixteen days after Casumpang won reelection to the office of Maui Division Director and eleven days after Tacdol filed an appeal from the election results. Eleven days after the amendment, the Local ordered Casumpang to provide information regarding whether he had worked as an electrical contractor after June 4, 1996. The record also shows that on December 29, 1997, Casumpang filed a letter accusing the Local of "an attempt to selectively prosecute me as a result of my election to the office of Division Director." Thus, contrary to the Local's assertion, the record contains evidence that raises a disputed question of fact regarding whether the Local amended its constitution within three months of Casumpang's criticism of the Local leadership to facilitate the suspension of Casumpang's membership in good standing.
 
 
 110
 The circumstantial evidence of the temporal proximity between Casumpang's criticism of the leaders of Local 142 and the Local's amendment to its constitution was amply corroborated by other actions taken against Casumpang. For example, shortly after Casumpang made his critical comments at the 1997 convention, the Local invalidated Casumpang's election as a business agent, found Casumpang guilty of engaging in outside employment, suspended his status as a member in good standing, and made the suspension retroactive, thereby precluding him from being nominated for the rerun election for the office of Division Director. Because the district court dismissed this action on jurisdictional grounds, Casumpang did not have the opportunity to seek discovery of facts known to the Local or its agents. We therefore cannot determine from the present record whether the Local's officers made further statements that would suggest Casumpang was punished for the expression of his statutorily protected speech. The district court erred in finding that Casumpang "failed to demonstrate any evidence of a relationship between the January 17, 1998 determination of the Judicial Panel and the exercise of any Title I rights."
 
 
 111
 The Local counters that factual allegations in a complaint are not sufficient to counter a motion to dismiss. It argues that Casumpang failed to present any evidence to rebut the affidavits offered in support of the motion to dismiss alleging that Casumpang was suspended for engaging in outside employment in violation of the Local's constitution. We reject this contention.
 
 
 112
 In Trentacosta v. Frontier Pacific Aircraft Industries, Inc., 813 F.2d 1553 (9th Cir. 1987), we held that a nonmoving party must present "evidence outside his pleadings in opposition to a motion to dismiss for lack of subject matter jurisdiction" whenever "the movant, either in his motion or in any supporting materials, denies or controverts the pleader's allegations of jurisdiction." Id. at 1559. Because the plaintiff in Trentacosta had failed to "file any affidavit or other evidentiary material in opposition to the defendants' motion to dismiss," we affirmed the district court's dismissal for lack of jurisdiction. Id. at 1557. In Trentacosta, however, we noted that "there [was] simply nothing" in the record to indicate that subject matter jurisdiction existed. Id. Here, the amended and pre-amended versions of the Local's constitution were offered as exhibits at the dismissal proceedings.
 
 
 113
 The proximity in time between the suspension of Casumpang's membership in good standing and the expression of his views at the union's convention in September, 1997, combined with the December 12, 1997 amendment to the Local's constitution, were sufficient to raise a rebuttable presumption of retaliation. "[W]hen `ruling on a jurisdictional motion involving factual issues which also go to the merits, the trial court should employ the standard applicable to a motion for summary judgment.' Under this standard,`the moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.' " Id. at 1558 (quoting Augustine v. United States, 704 F.2d 1074, 1077 (9th Cir. 1983)). Because "material jurisdictional facts" were in dispute, the district court erred in concluding that it lacked subject matter jurisdiction over Casumpang's claim under Title I of the LMRDA.
 
 II. Exhaustion of Union Remedies
 
 114
 After concluding that Casumpang's second amended complaint did not substantially involve Title I rights, the district court stated that even if a Title I claim had been properly pleaded, it "would still dismiss the complaint because Plaintiff failed to exhaust internal union procedures in a timely fashion." The court stated that "determining whether a union member must first exhaust internal union remedies is a matter of judicial discretion." (emphasis added).
 
 
 115
 Because the district court determined that Title IV governed Casumpang's claim, it appears to have conducted its analysis of the exhaustion issue pursuant to the requirements of Title IV rather than those set forth in Title I. The district court stated that Casumpang's "fail[ure] to exhaust internal union remedies in a timely fashion with regard to[Casumpang's] Title IV claims would also apply to [his] Title I claims." In fact, Titles I and IV of the LMRDA treat exhaustion differently. Title IV requires a union member to exhaust internal union remedies before filing a complaint with the Secretary of Labor. LMRDA &#167 402(a), 29 U.S.C.&#167 482(a). Title IV provides, in relevant part:
 
 
 116
 (a) Filing of complaint; presumption of validity of challenged election
 
 
 117
 A member of a labor organization -
 
 
 118
 (1) who has exhausted the remedies available under the constitution and bylaw of such organization and of any parent body, or
 
 
 119
 (2) who has invoked such available remedies without obtaining a final decision within three calendar months after their invocation, may file a complaint with the Secretary [of Labor] within one calendar month thereafter alleging the violation of any provision of section 481 of this title (including violation of the constitution and bylaws of the labor organization pertaining to the election and removal of officers). . . .
 
 
 120
 LMRDA &#167 402(a)(1),(2); 29 U.S.C. &#167 482(a)(1),(2) (emphasis added).
 
 By contrast, Title I provides that:
 
 121
 No labor organization shall limit the right of any member thereof to institute an action in any court . . . . Provided, That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time ) within such organization, before instituting legal . . . proceedings against such organization[ ] or any officer thereof . . . . LMRDA &#167 101(a)(4), 29 U.S.C. &#167 411(a)(4) (emphasis added).
 
 
 122
 The Supreme Court has determined that LMRDA &#167 101(a)(4) is "a statement of policy that . . . public tribunals . . . may in their discretion stay their hands for four months, while the aggrieved person seeks relief within the union." NLRB v. Indus. Union of Marine & Shipbuilding Workers, 391 U.S. 418, 426 (1968) ("Marine Workers"). LMRDA &#167 101(a)(4) was "not intended to limit in any way the right of a union member . . . to file unfair labor practice charges against a union." Id. at 427 (emphasis added) (quoting 105 Cong. Rec. 18152 (1960) (statement of Rep. Griffin)). Under Title I, district courts retain broad discretion to require, or not to require, exhaustion depending on the reasonableness of such requirement in light of the facts of each case. Id. at 427-28.
 
 
 123
 The Supreme Court clarified its view of the exhaustion doctrine in Clayton v. International Union, United Automobile, Aerospace & Agricultural Implement Workers, 451 U.S. 679 (1981):
 
 
 124
 In exercising this discretion [to exhaust], at least three factors should be relevant [to a district court]: first, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, whether the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks . . . ; and third, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim.
 
 
 125
 Id. at 689.
 
 
 126
 Although Clayton involved an action brought pursuant to the Labor Management Relations Act, its three-factor test also applies to actions brought under the LMRDA. See Maddalone v. Local 17, United Bhd. of Carpenters & Joiners, 152 F.3d 178, 186 n.3 (2d Cir. 1998) ("Although the Court in Clayton articulated these factors in the context of [a ] &#167 301 claim, they are generally relevant to whether exhaustion should be required under the LMRDA."); Stevens v. Northwest Ind. Dist. Council, 20 F.3d 720, 733 n.31 (7th Cir. 1994) ("[G]enerally the Clayton considerations are proper guide-posts to aid the exercise of exhaustion-excusal discretion under Title I of the LMRDA.").
 
 
 127
 Where one of the three Clayton factors has not been satisfied, internal union remedies are deemed presumptively inadequate and the district court abuses its discretion by requiring exhaustion. See Clayton, 451 U.S. at 691, 692 (requiring exhaustion is error where the union can "neither reinstate [the complaining member] in his job, nor reactivate his grievance" because "these restrictions on the relief available . . . render [the internal union] procedures inadequate") (citation omitted)). The burden is on "the moving party . . .[to] establish the availability of adequate internal union remedies." Scoggins v. Boeing Co., 742 F.2d 1225, 1230 (9th Cir. 1984).
 
 
 128
 In this matter, the district court analyzed only the first factor articulated in Clayton. It rejected Casumpang's contention that his pursuit of internal remedies would have been futile merely because Casumpang would have to appeal to the same individuals who suspended him. The Local does not explain, and the record does not reveal, whether the internal grievance procedures maintained by Local 142 satisfy the two remaining Clayton factors. For example, more than two years have passed since Casumpang filed his original complaint in the district court. Assuming Casumpang has missed an internal deadline for filing a grievance with Local 142, nothing in the record demonstrates that the "internal union appeals procedures" maintained by Local 142 will permit Casumpang "to reactivate [his] grievance." Clayton , 451 U.S. at 689. Nor is it clear that the internal grievance procedures maintained by Local 142 are capable of awarding Casumpang "the full relief he seeks"; namely, reinstatement as a member in good standing and money damages for the Local's alleged violation of his rights under Title I. Id. Finally, it is unclear "whether exhaustion of internal [union grievance] procedures would unreasonably delay [Casumpang's] opportunity to obtain a judicial hearing on the merits of his claim." Id. We cannot determine, on the record before us, whether any grievance procedure maintained by Local 142 is likely to be completed within the four month time span provided for in LMRDA &#167 101(a)(4). We conclude the district court abused its discretion by ordering exhaustion without conducting an analysis under Clayton.
 
 CONCLUSION
 
 129
 The district court erred in concluding that it lacked subject matter jurisdiction over the Title I claim set forth in Casumpang's second amended complaint. Contrary to the district court's conclusion, Casumpang did not directly challenge the validity of the 1998 rerun election. Instead, he sought a declaration that his Title I rights as a union member had been violated and a restoration of his privileges as a member in good standing, as well as an award of compensatory and punitive damages. Under these circumstances, Title IV does not bar an election-related tort claim filed pursuant to Title I.
 
 
 130
 The district court also abused its discretion in dismissing this action with prejudice on the alternative ground that Casumpang failed to exhaust internal union remedies before filing this action. Upon remand, the district court is instructed to determine whether the internal grievance procedures maintained by Local 142 meet the requirements laid out in Clayton. Should the district court determine that the Clayton requirements are met, it may dismiss Casumpang's claim without prejudice and require Casumpang to pursue internal union remedies for a period of time not to exceed four months. Should the district court instead determine that the grievance procedures maintained by Local 142 do not satisfy the standards articulated in Clayton, it may not compel Casumpang to exhaust union remedies as a prerequisite to entertaining his suit under Title I.
 
 
 131
 VACATED and REMANDED with instructions.
 
 
 
 Notes:
 
 
 [1]
 At the time, Article II, &#167 1 of the Local's constitution read in relevant part: "Elected . . . full-time officials of the Local, while on the Local payroll, shall not be permitted to hold any other gainful position unless authorized by the Executive Committee with the approval of the Local Executive Board."
 
 
 [2]
 LMRDA &#167 401(b) reads as follows:
 Every local labor organization shall elect its officers not less often than once every three years by secret ballot among the members in good standing.
 
 
 [3]
 Section 27.10.5 of the Local's constitution (1997) provides:
 After the decision [of the Judicial Panel ] is reached and recorded, the accused shall be called in and informed of the decision by the Chair of the Judicial Panel. If the accused is found guilty, the Chair of the Judicial Panel shall advise them [sic] of their rights of appeals [sic] to the Local Executive Board[,] to the Local membership[,] and to the International Union.
 In an appeal to the Local membership, the accused shall have the right to appear at each unit membership meeting for the purpose of pleading their case. The membership of each unit shall vote thereon, and the majority of the total membership's votes shall determine the result.
 
 
 [4]
 LMRDA &#167 412 reads:
 Any person whose rights secured by the provisions of this sub-chapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. Any such action against a labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located.
 
 
 [5]
 LMRDA &#167 &#167 101(a)(1), (2) provide:
 (a)(1) Equal rights
 Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.
 (2) Freedom of speech and assembly
 Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.
 
 
 [6]
 "[T]he purpose of Title IV of the LMRDA is to provide free and democratic elections" while giving effect to the "countervailing policy . . . that unions should be free to conduct their affairs so far as possible and the government should not become excessively involved in union politics." Reich v. Local 89, Laborers' Int'l Union, 36 F.3d 1470, 1476 (9th Cir. 1994). Under Title IV:
 In any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to section 504 of this title and to reasonable qualifications uniformly imposed) . . . .
 LMRDA &#167 401(e), 29 U.S.C. &#167 481(e).
 A member of a labor organization --
 (1) who has exhausted the remedies available under the constitution and bylaws of such organization and of any parent body . . . may file a complaint with the Secretary [of Labor] within one calendar month thereafter alleging the violation of any provision of section 481 of this title . . . .
 LMRDA &#167 402(a)(1), 29 U.S.C. &#167 482(a)(1).
 The Secretary shall investigate such complaint and, if he finds probable cause to believe that a violation of this subchapter has occurred and has not been remedied, he shall, within sixty days after the filing of such complaint, bring a civil action against the labor organization as an entity in the district court of the United States in which such labor organization maintains its principal office to set aside the invalid election . . . .
 LMRDA &#167 402(b), 29 U.S.C. &#167 482(b).
 The remedy provided by this subchapter for challenging an election already conducted shall be exclusive
 LMRDA &#167 403, 29 U.S.C. &#167 483.
 
 
 [7]
 "Title I is designed to guarantee every union member equal rights to vote and otherwise participate in union decisions, freedom from unreasonable restrictions on speech and assembly, and protection from improper discipline." Local No. 82, Furniture & Piano Moving, Furniture Store Drivers v. Crowley, 467 U.S. 526, 536-37 (1984); LMRDA &#167 &#167 101(a)(1), (2), 29 U.S.C. &#167 &#167 411(a)(1),(2). "Section 102 creates a federal cause of action for infringement of the rights provided in &#167 101. LMRDA[ ] &#167 102, 29 U.S.C. &#167 412." Murray v. Laborers Union Local 324, 55 F.3d 1445, 1453 n.9 (9th Cir. 1995).
 
 
 [8]
 At oral argument before us, Casumpang's counsel represented that since the initiation of this action the term of office for the position of Maui Division Director expired in the year 2000. A subsequent election was held in that year. The Local did not dispute this representation. Cf. Ross, 513 F.2d at 841 (concluding that plaintiff's claims for injunctive and declaratory relief against the running of a union election were rendered moot where the election had already occurred by the time of plaintiff's appeal).