Nicanor E. CASUMPANG, Jr. Plaintiff,

v.

INTERNATIONAL LONGSHORE & WAREHOUSE UNION, LOCAL 142, and Eusebio Lapenia, Jr., Defendants.

No. CIV. 98–00775ACKKSC.

United States District Court,
D. Hawai'i.

Oct. 31, 2005.

---

Jerry P.S. Chang, Shawn A. Luiz, Honolulu, HI, for Plaintiff.

Daniel T. Purtell, Fred H. Altshuler, Laura P. Juran, Altshuler Berzon Nussbaum Rubin & Demain, San Francisco, CA, Danny J. Vasconcellos, Herbert R. Takahashi, Rebecca L. Covert, Stanford H. Masui, Takahashi Masui Vasconcellos & Covert, Honolulu, HI, for Defendants.

***ORDER DENYING ILWU'S MOTION FOR JUDGMENT AS A MATTER OF LAW, DENYING IN PART ILWU'S MOTION FOR A NEW TRIAL, AND SETTING REMITTITUR***

KAY, District Judge.

Nicanor E. Casumpang ("Plaintiff") filed this lawsuit on September 23, 1998, alleging, among other things, that he was fined and suspended from membership in International Longshore & Warehouse Union, Local 142, ("ILWU," "Defendant," or the union), by ILWU and Eusebio Lapenia, Jr. (ILWU's former president), in retaliation for criticizing union leadership and/or policies in violation of the Labor Management Reporting and Disclosure Act. After years of litigation, which included the Ninth Circuit's reversal and remand of this Court's order dismissing the action, this claim was the sole remaining claim that went to trial on May 3, 2005. At the close of the thirteen day trial, ILWU and Mr. Lapenia made a motion pursuant to Federal Rule of Civil Procedure 50 for judgment as a matter of law, which the Court denied.

After approximately two days of deliberation, on May 26, 2005, the jury returned a verdict against ILWU. Specifically, the jury found ILWU liable for retaliation against Plaintiff and awarded the following damages: $90,000 for injury to reputation; $150,000 for emotional distress; and $1 million for punitive damages. The jury found Mr. Lapenia not liable for retaliation against Plaintiff.

On June 14, 2005, ILWU filed a Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial or Reduction of Damages Award, seeking entry of judgment as a matter of law under Federal Rule of Civil Procedure 50 or a new trial or reduction of the damages award under Federal Rule of Civil Procedure 59.[1] On June 27 2005, Plaintiff filed an Opposition. On July 8, 2005, ILWU filed a Reply. The Court finds the motion suitable for disposition without a hearing. *See* L.R. 7.2(d).

In this order, the Court takes the following action: denies ILWU's motion for judgment as a matter of law; denies ILWU's motion for a new trial as it applies to ILWU's liability; and grants ILWU's motion for a new trial on the issue of damages unless Plaintiff agrees to remit the punitive damages in excess of $240,000.

## I. BACKGROUND

### A. Legal Background

The Labor Management Reporting and Disclosure Act ("LMRDA") provides every member of any labor union the right to meet and assemble freely with other members, express views, arguments, or opinions, and to express at meetings of the labor union his views upon candidates in an election or upon any business properly

---

1. Mr. Lapenia, who was found not liable by the jury, did not join in the motion.

before the meeting, subject to the union's established and reasonable rules pertaining to conduct of the meetings. *See* 29 U.S.C. § 411(a)(2). Plaintiff alleges that his free speech rights under the LMRDA were infringed by ILWU because it allegedly suspended and fined him in retaliation for speaking out against union leadership and union policies.

██ At trial, the burden is on Plaintiff to prove the following elements by a preponderance of the evidence: (1) he exercised the right to oppose union leadership and/or union policies; (2) he was subjected to retaliatory action; and (3) the retaliatory action was a direct result of his decision to express disagreement with the union's leadership and/or union policies. *See Casumpang v. Int'l Longshoremen's and Warehousemen's Union, Local 142*, 269 F.3d 1042, 1058 (9th Cir.2001). To prove these elements, Plaintiff may use direct and/or circumstantial evidence. *See, e.g., Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1066 (9th Cir.2003); *Casumpang*, 269 F.3d at 1058–1059. If Plaintiff offers only circumstantial evidence that the union's motive was different from its stated motive, such circumstantial evidence must be specific and substantial evidence of pretext. *See Stegall*, 350 F.3d at 1066; *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir.2002). Additionally, causation can be inferred from timing alone where the retaliatory action follows on the heels of protected activity, but the adverse action must have occurred "fairly soon" or "very close" in time after the protected activity. *See Clark County School District v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001); *Villiarimo*, 281 F.3d at 1065.

## B. Testimony and Evidence Presented at Trial

Plaintiff was formerly a member in good standing and full time, elected employee of

ILWU on Maui, where he served as a business agent. In January 1998, Plaintiff lost his ability to hold any elected employment with ILWU when he was suspended as a member in good standing for nine years and fined $7,636. Plaintiff introduced evidence at trial that he was suspended and fined in retaliation for criticizing union policies and union leadership. Defendant introduced evidence at trial that Plaintiff was not suspended and fined in retaliation for his criticism, but was suspended and fined because he violated ILWU's constitution by engaging in outside gainful employment while he was a business agent. As background, the Court will provide a summary of the testimony and evidence presented at trial; however, this summary is not meant to be all inclusive.

Plaintiff testified that he expressed criticism over the union leadership's positions on multiple issues over the years that he served as a business agent. Plaintiff testified that he questioned the union leadership on political action committee ("PAC") funds that were collected from the membership and repeatedly requested an accounting of how those funds were spent. Plaintiff testified that he expressed disagreement with the union leadership's handling and settling of a labor dispute with Monarch Building Supply ("Monarch") in 1995 and 1996. He also testified that he expressed disagreement with the union leadership while he was part of a negotiating team involving the Royal Lahaina contract negotiations in 1996 and 1997 (specifically raising concerns about the participation of lawyers in the negotiation process and the leadership's desire to eliminate snap back payments to members in favor of a health and welfare program).

Plaintiff testified that in June 1997, he formally announced his intention to run

against incumbent Roger Tacdol for the elected position of Maui Division Director in the November 1997 ILWU elections because he did not agree with the direction of the ILWU Maui Division. Plaintiff testified that in August 1997 (after he announced his candidacy), ILWU leadership—at the directive of Guy Fujimura (Secretary Treasurer of ILWU)—began an investigation into Plaintiff's daily activities involving the Filipino Chamber of Commerce of Maui (to which Plaintiff had been elected president).

Plaintiff testified that his criticism of the union leadership and union policies came to a head at the annual ILWU convention in September 1997, where he engaged in approximately five to ten public "heated debates" with Mr. Lapenia (then-president of ILWU) about issues including PAC fund accounting, snap back payments, the health and welfare program, participation of lawyers in negotiations, and proposed constitutional amendments. Plaintiff testified that these heated debates took place at the constitutional committee meetings at the 1997 convention.

Plaintiff testified and presented evidence that he won the November 1997 election against Mr. Tacdol for Maui Division Director, but that the election was contested and scheduled for a re-run election to take place in January 1998.[2]

Plaintiff had previously been investigated (in February through April of 1996) for allegedly engaging in outside activity as an electrical contractor, in violation of article II, section 1 of the 1995 constitution (which prohibited "elected and appointed full-time officials of the Local" from holding "other gainful position[s]"). In April 1996, Plaintiff agreed to a cease and desist order stating that he would cease and desist from activity as an electrical contractor. Plaintiff testified that also in April 1996, while he was serving a 60–day suspension for an unrelated matter regarding sexual harassment, Mr. Lapenia gave him permission to conduct outside electrical contracting work.

On December 23, 1997, Plaintiff received notice of an investigation into his activity as an electrical contractor subsequent to the 1996 cease and desist order. Shortly thereafter, written specific charges were signed against Plaintiff by thirteen union members (including the three ILWU titled officers: Mr. Lapenia, Mr. Girald, and Mr. Fujimura). Plaintiff testified that the majority of these thirteen members witnessed his heated debates with Mr. Lapenia at the 1997 convention. The written specific charges directed the judicial panel to take appropriate action, "including but not limited to suspending [Plaintiff] from service as a full-time officer of the ILWU Local 142."

Plaintiff testified and submitted evidence regarding his ensuing January 1998 trial before the judicial panel.[3] The judi-

---

2. Plaintiff is not challenging the result of the election or re-run election in this lawsuit. Accordingly, the Court instructed the jury that "You have heard evidence regarding elections for Local 142 officers that occurred in 1997 and 1998. Mr. Casumpang is not challenging the result of these elections for Maui Division Director. You may consider evidence regarding the 1997–98 elections of Local 142 only to the extent you find that such evidence is related to the Plaintiff's claim that his membership was suspended and he was fined because he

criticized union leadership and/or union policies." The parties agreed to this instruction, which is based on a proposed instruction submitted by Defendant. See Transcript of Further Settling of Jury Instructions at 5, 11–15 (agreeing to all jury instructions but expressing concern over Court's pretrial ruling with respect to the operation of Title IV preemption).

3. The parties presented conflicting evidence regarding whether ILWU amended its constitution in 1997 for the purpose of providing

cial panel rendered a verdict against Plaintiff that: (1) Plaintiff violated the constitution on nine occasions by engaging in activity as an electrical contractor after the cease and desist order of April 1996, and (2) there was insufficient evidence to sustain the charge that Plaintiff improperly used union resources in 1997 to promote his activities as president of the Filipino Chamber of Commerce of Maui. As punishment, the panel suspended Plaintiff as a member in good standing of ILWU for a period of nine years, during which time he is ineligible to serve as an officer of ILWU or its units, and fined him $7,636.

Plaintiff testified that he suffered damages as a result of the suspension and the resulting litigation. Among other things, Plaintiff testified that: he had to work a second job at night to make up for the decrease in salary that came with the loss of his elected position; as a result of working a second job, he missed watching his children grow up; he could not afford to make his mortgage payments because of his decrease in salary and was humiliated that his house was listed in the newspaper for foreclosure; he was ashamed and embarrassed and seldom attended social functions; he lived in fear of retribution for the litigation; he lost sleep and lost his sexual appetite; he aggravated his high blood pressure; and he gained weight. Plaintiff testified that his relationships with his son and daughter were damaged as a result of the retaliation because he could not afford to send his son to college or his daughter to design school.

Former ILWU members Cynthia Kanoho and Linda DeLima testified about Plaintiff's support of the picketers during the Monarch labor dispute in 1995 and 1996. Ms. Kanoho stated that she thought that Plaintiff "was standing all alone pushing for" the picketers and that Plaintiff was "getting lash back" from the union leadership, but that nothing she saw or heard led her to believe there was animosity between Plaintiff and the union leadership. Ms. DeLima testified that Plaintiff conveyed to the picketers a $50,000 settlement offer initially but later reduced that figure to $13,500 (a fact that Plaintiff testified was a point of contention between himself and the leadership, because he did not want to accept the leadership's agreement to the reduced figure). Finally, Ms. DeLima testified that Plaintiff supported the picketers but that the union leadership had a different agenda because the picketing was costing too much money.

David Gomes and Michael Mercurio, both members of the negotiating committee during the Royal Lahaina contract negotiations, testified for Plaintiff regarding those negotiations in 1996 and 1997. Mr. Gomes testified that Plaintiff and Mr. Lapenia disagreed over whether the contract should provide snap back payments to the members or whether the snap back money should be used to fund a health and welfare program; Mr. Gomes testified that he witnessed "strong discussions" between Plaintiff and Mr. Lapenia that were not of a "friendly connotation." Mr. Mercurio testified that Mr. Lapenia attempted to set aside the ratification of the negotiated contract because the negotiated contract did not call for the use of the snap back money to fund the health and welfare program.

Mr. Mercurio also testified that he witnessed "heated arguments" between Plaintiff and Mr. Lapenia on approximately three separate occasions at the 1997 convention. Mr. Mercurio testified that these arguments included discussion of PAC

that Plaintiff would be prohibited from conducting his electrical contracting business and whether the judicial panel used the amended 1997 constitution, the 1995 constitution, or both in its prosecution of Plaintiff.

funds, Plaintiff's involvement in the Filipino Chamber of Commerce, and other issues. Mr. Mercurio testified that Mr. Lapenia "shouted" at Plaintiff, spoke in a "high voice," and was "upset." Mr. Mercurio testified that he thought Plaintiff and Mr. Lapenia might "throw blow[s]" and that the exchange was not normal behavior for a convention meeting. Mr. Mercurio also testified that, in addition to other union members, at least two of the union members whose signatures appear on the subsequent written charges against Plaintiff witnessed these heated arguments between Plaintiff and Mr. Lapenia.

Plaintiff's witness Sheldon Biga testified that he witnessed Plaintiff raise objections with ILWU leadership about PAC funds and about ILWU's policy of having attorneys attend negotiations. Mr. Biga testified that Plaintiff raised one or more issues at approximately six division meetings and that Mr. Lapenia disagreed with Plaintiff and "acted not happy with the question;" Mr. Biga later described the exchanges between Mr. Lapenia and Plaintiff as "heated arguments." Mr. Biga also testified that Plaintiff and Mr. Lapenia had an exchange in November or December 1997 about one or more issues at a local board meeting.

Mr. Biga testified about a camaraderie among the three top local officers (Mr. Lapenia, Mr. Girald, and Mr. Fujimura) and testified that "if you wouldn't question [their decisions or ILWU policies] and you wouldn't complain, you'd be alright," but if you did raise a question or complaint, "then you'd be in trouble." Mr. Biga also testified regarding Mr. Tacdol's relationship with the division officers and business agents, saying that "if you didn't ruffle feathers, if you didn't question decisions, you'd be alright. If you did, you'd be out in the cold." Mr. Biga went on to testify that Plaintiff raised the most questions with the leadership and questioned the

decisions of the leadership. Plaintiff rested his case after testifying and calling these five witnesses.

Defendants called a total of thirteen witnesses. Robert Girald, former vice-president of ILWU, testified that in 1995 he was directed by Mr. Lapenia to investigate a formal complaint of sexual harassment filed against Plaintiff. In investigating the sexual harassment complaint, Mr. Girald testified that he learned from Plaintiff that Plaintiff had an outside electrical contracting business. Mr. Girald testified that, as a result of this information, he and the other titled officers (Mr. Lapenia and Mr. Fujimura) requested information from Plaintiff about the electrical contracting business, so that they could determine whether Plaintiff was violating a constitutional prohibition (contained in article II, section 1 of ILWU's constitution) against outside employment.

Mr. Girald testified that as a result of the requests for information and Plaintiff's partial response, formal written charges were signed against Plaintiff by the local executive committee (consisting of the three titled officers and the division directors from each of the four islands), charging Plaintiff with violating article II section 1 of the constitution and requesting the trial committee to "take appropriate action." Mr. Girald testified that as a result of the trial, a cease and desist order was entered and agreed to by Plaintiff. The cease and desist order, dated April 16, 1996, stated that Plaintiff violated article II, section 1 of the constitution, that Plaintiff would cease and desist from his activity as an electrical contractor, and that prior to engaging in any future gainful position as an electrical contractor, Plaintiff would secure authorization from the local executive board. Mr. Girald testified that Plaintiff's subsequent request for authorization was denied, but that Mr.

Lapenia had granted Plaintiff permission to engage in employment as an electrical contractor during Plaintiff's 60–day suspension for sexual harassment in 1996.

Mr. Girald testified that as a result of Plaintiff informing him that other business agents allegedly were engaging in outside employment, Mr. Girald requested information from three other individuals. Mr. Girald testified that those individuals provided written responses and Mr. Girald concluded that no violations had occurred.

Mr. Girald testified that in January 1998, charges were brought against Plaintiff for violating the 1996 cease and desist order and violating the constitution subsequent to the cease and desist order by engaging in outside employment. Mr. Girald testified that he represented the charging parties in presenting the case against Plaintiff at the judicial panel trial.

William Kennison, former business agent and current Maui Division Director, testified that he represented Plaintiff in 1996 when Plaintiff was charged with violating article II, section 1 of the constitution. Mr. Kennison testified that prior to the judicial panel trial, Plaintiff entered into a cease and desist order; according to Mr. Kennison, Plaintiff did not express any confusion about the terms of the cease and desist order or express any belief that article II, section 1 of the constitution did not apply to him. Finally, Mr. Kennison testified that he did not recall any arguments between Mr. Lapenia and Mr. Casumpang on the main floor of the 1997 convention or at any other meetings.

Joyce Naruse and Joycelyn Victorino, clerks at the Maui division office of ILWU, testified regarding information they collected (at the instruction of Mr. Tacdol and Mr. Fujimura) regarding non-union activities that Plaintiff conducted at the ILWU office. In particular, Ms. Naruse and Ms. Victorino testified regarding documents they provided summarizing Plaintiff's telephone calls about the Filipino Chamber of Commerce and outside electrical work.

Guy Fujimura, Secretary–Treasurer of ILWU, testified that he learned in the summer of 1997 that Plaintiff had been elected to the position of president of the Filipino Chamber of Commerce, which raised a concern with Mr. Fujimura that Plaintiff may have been engaging in electrical contracting work. Mr. Fujimura testified that he launched an investigation into Plaintiff's outside activities, which resulted in a letter being sent to Plaintiff on December 23, 1997 requesting additional information. Mr. Fujimura testified that at the time he launched the investigation, he knew Plaintiff had announced his candidacy against Mr. Tacdol for the position of Maui Division Director; Mr. Fujimura testified that the December 23, 1997 letter to Plaintiff was sent approximately four weeks after Plaintiff won the election for Maui Division Director.

Mr. Fujimura testified that in January 1998, written charges were executed against Plaintiff. In the written charges, Plaintiff was charged with: violating the cease and desist order and article II, section 1 of the constitution by submitting electrical permit applications as an electrical contractor and obtaining county approval to perform work as an electrical contractor; and violating the financial code of ILWU (as incorporated into the constitution) by utilizing money, property, and resources of the union while acting as president of the Filipino Chamber of Commerce. The written charges directed the judicial panel "to take appropriate action, including but not limited to suspending Casumpang from service as a full-time officer." The written charges are signed by the three titled officers and ten other ILWU members.

The judicial panel that held a trial on the written charges consisted of five mem-

bers, all of whom testified at the trial before this Court. Michael Machado, Nathan Lum, Daisy Nakamoto, Merton Davalos, and Brandon Bajo–Daniel all testified that they did not sign the Decision and Order of the Judicial Panel to retaliate against Plaintiff.

Kathleen Luka, a member of the constitutional committee at the 1997 convention, testified that nothing Plaintiff said at the 1997 convention constitutional committee meetings stands out in her mind, and that Plaintiff and Mr. Lapenia did not get into shouting matches or look like they were going to "come to blows."

Mr. Lapenia testified that he was never upset or angry with Plaintiff regarding the Monarch dispute, Royal Lahaina negotiations, or 1997 convention, although he was "disappointed" with Plaintiff at the 1997 convention. Mr. Lapenia testified that he and Plaintiff disagreed about certain issues in the Royal Lahaina negotiations and at the 1997 convention, but that at the 1997 convention, he never shouted at Plaintiff and he and Plaintiff never came close to blows. Mr. Lapenia testified that the actions he took against Plaintiff regarding the charges (which ultimately led to Plaintiff's suspension and fine) were not undertaken in retaliation for Plaintiff speaking out against Mr. Lapenia or ILWU leadership.

Mr. Lapenia also testified that in April 1996, he gave Plaintiff permission to engage in work as an electrical contractor only while serving a 60–day suspension related to sexual harassment charges.

Fred Galdones, the current ILWU president, testified that he sat as the acting president of ILWU for Plaintiff's appeal of the judicial panel's Decision and Order suspending and fining Plaintiff (because Mr. Lapenia, the president, was disqualified for conflict as a result of his involvement in bringing the charges against Plaintiff and/or participating in the trial before the judicial panel). Mr. Galdones testified that he had no reason to believe that any of the local executive board members who heard the appeal were biased. He testified that in deciding the appeal, the board did not review the transcript of the judicial panel trial or parts of the Decision and Order itself, but that the board relied on whatever Mr. Machado said on behalf of the judicial panel.

## II. MOTION FOR JUDGMENT AS A MATTER OF LAW

### A. Standard for Motion for Judgment as a Matter of Law

If, at the close of evidence at trial, a party makes a motion for judgment as a matter of law which is not granted by the Court, that party may renew its request by filing a renewed motion after entry of judgment. *See* Fed.R.Civ.P. 50(b). A renewed motion for judgment as a matter of law is governed by Federal Rule of Civil Procedure 50(b) ("Rule 50(b)"), which provides in relevant part:

> If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may:
>
> (1) if a verdict was returned:
>
> (A) allow the judgment to stand,
>
> (B) order a new trial, or

(C) direct entry of judgment as a matter of law.

Fed.R.Civ.P. 50(b).

Judgment as a matter of law is authorized "if there is no legally sufficient basis for a reasonable jury to find in favor of [Plaintiff]." *Bell v. Clackamas County,* 341 F.3d 858, 865 (9th Cir.2003) (citing Fed.R.Civ.P. 50(a)). The jury verdict will be affirmed if it is supported by substantial evidence. *Mockler v. Multnomah County,* 140 F.3d 808, 815 n. 8 (9th Cir. 1998). "Substantial evidence is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Gilbrook v. City of Westminster,* 177 F.3d 839, 856 (9th Cir.1999) (internal quotations and citations omitted).

"[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.' " *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, in deciding whether judgment as a matter of law is warranted, the Court may not assess the credibility of witnesses and must draw all reasonable inferences in the nonmovant's favor (in this case, Plaintiff). *Bell,* 341 F.3d at 865. The Court "may not substitute its view of the evidence for that of the jury." *Johnson v. Paradise Valley Unified Sch. Dist.,* 251 F.3d 1222, 1227 (9th Cir.2001). *See also Harvey v. Office of Banks and Real Estate,* 377 F.3d 698, 707 (7th Cir.2004) ("Our job at this stage is not to determine whether the jury believed the right people, but only to assure that it was presented with a legally sufficient basis to support the verdict.") (citation omitted).

In the context of Title VII claims, which the Ninth Circuit Court of Appeals in this case analogized to retaliation claims under the LMRDA, "[a]fter a full trial, the only pertinent question is whether there was enough evidence to permit the jury to consider the ultimate question . . . of retaliation . . . . It is not . . . an occasion for the court to march back through the intermediary burden-shifting steps established by *McDonnell Douglas.* We instead look to the totality of the evidence to determine whether plaintiffs presented sufficient evidence to support the jury's determinations that they were the victims of intentional . . . retaliation." *Harvey,* 377 F.3d at 707–708 (citations omitted).

### B. Analysis of Motion for Judgment as a Matter of Law

█ The Court denies the motion for judgment as a matter of law because, in drawing all reasonable inferences in Plaintiff's favor and not assessing the credibility of the witnesses, the Court finds that there is a legally sufficient basis for a reasonable jury to find in favor of Plaintiff and the jury verdict is supported by specific and substantial evidence. The Court does not find merit in Defendant's argument that the evidence is legally insufficient to prove that Plaintiff was disciplined as a direct result of his speech. *See* Motion at 13.

Plaintiff presented specific and substantial circumstantial evidence of retaliation. He presented evidence through his testimony and the testimony of Ms. Kanoho, Ms. Delima, Mr. Gomes, Mr. Mercurio, and Mr. Biga that Plaintiff had repeatedly expressed disagreement with union leadership and/or policies over a period of years, so that Plaintiff was something of a thorn in the side of the leadership. Plaintiff, Mr. Mercurio, and Mr. Biga all testified about numerous public, heated exchanges between Plaintiff and Mr. Lapenia, in which

Plaintiff spoke out against the union leadership and/or union policies. Mr. Lapenia conceded that he and Plaintiff publicly disagreed over issues in the Royal Lahaina negotiations and at the 1997 convention, although Mr. Lapenia did not describe those exchanges as being heated—he testified that he was not upset, but was disappointed in Plaintiff. A reasonable person could consider this evidence to demonstrate a motivation by union leadership to retaliate against Plaintiff for speaking out.

Plaintiff presented additional evidence of the union's motivation to retaliate against him. Plaintiff testified that he won an initial election in November 1997 to serve as Maui Division Director of ILWU, but that as a result of his suspension and fine in January 1998, Plaintiff was not eligible to run in a re-run election that was held for that office.[4] A reasonable jury could infer that because of Plaintiff's criticism of the ILWU leadership and policies, the ILWU leadership was motivated (and acted) to suspend him to keep him out of the elected leadership position (where he could presumably interfere with the plans and policies of the ILWU leadership).

Along with the evidence of motivation for retaliation, Plaintiff presented evidence that the union acted on its retaliatory motivation when it suspended and fined him. For example, Plaintiff presented some evidence, through his testimony and the testimony of Mr. Biga, that other business agents engaged in outside activities but were not disciplined as a result. Mr. Lapenia testified that in thirty years, Plaintiff was the only ILWU member ever "persecuted" under article II, section 1 of the constitution. Other witnesses also testified that they were not aware of any other union member ever being charged with a violation of article II, section 1 of

the constitution. This evidence could lead a reasonable jury to conclude that Plaintiff was singled out for punishment in retaliation for his expression of disagreement with the union's leadership and/or union policies.

Plaintiff also presented some evidence that the ILWU members who signed the written charges and participated in the judicial panel were supporters of Mr. Lapenia and/or ILWU leadership. When combined with the other evidence presented by Plaintiff, this evidence could support a reasonable inference by the jury that the individuals who signed the written charges and participated in the judicial panel decision were aware of Plaintiff's speech and acted in retaliation. Moreover, Plaintiff presented evidence that the judicial panel suspended Plaintiff for one year based on a null and void permit that was superceded by another permit (for which they suspended Plaintiff an additional year)—a fact from which a reasonable person could conclude that the panel did not undertake an unbiased, impartial and complete review of the evidence in its proceedings against Plaintiff. Additionally, Mr. Galdones testified that the board that heard the appeal of the decision to suspend and fine Plaintiff did not even read the judicial panel transcript and at least one critical portion of the Decision and Order, but merely relied on whatever Mr. Machado said on behalf of the judicial panel.

The Court finds that the totality of the evidence is sufficient to support the jury's determination that Plaintiff was suspended and fined as a direct result of his criticism of union leadership and/or policies. *Harvey*, 377 F.3d at 707–708. Plaintiff presented specific and substantial evidence, which formed a legally sufficient basis for

---

**4.** In this action, Plaintiff does not challenge the validity of the election or the re-run election.

a reasonable jury to find against ILWU. *See* Fed.R.Civ.P. 50(a); *Bell,* 341 F.3d at 865.

The Court is unpersuaded by Defendant's argument that the evidence of temporal proximity is too weak to support the jury's verdict. *See* Motion at 14. Temporal proximity must be "very close" only when circumstantial evidence of timing is the *only* evidence supporting causation. *See Clark County School District v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001); *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1062 (9th Cir.2002).[5] Here, circumstantial evidence of timing was not the only evidence presented by Plaintiff to support causation. As discussed above, Plaintiff presented evidence of a retaliatory motive. Moreover, even if Plaintiff had not introduced other evidence to support causation, this Court has already found that Plaintiff's speech at the convention in September 1997 is sufficiently close in time to the notice of investigation, suspension and fine in December 1997 and January 1998 to support an inference of causation. *See* Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment at 18 (March 10, 2005).

Equally without merit is Defendant's argument that evidence of a legitimate, non-retaliatory reason for suspending Plaintiff "far outweighed" Plaintiff's evidence to the contrary. *See* Motion at 14. As discussed above, Plaintiff presented specific and sub-stantial evidence that he was suspended and fined as a direct result of his criticism of union leadership and/or union policies. In ruling on this motion for judgment as a matter of law, this Court may not assess credibility or draw inferences in Defendant's favor. *See Bell,* 341 F.3d at 865; *Johnson,* 251 F.3d at 1227.[6] In looking at all of the evidence, the Court finds that the jury was presented with legally sufficient evidence upon which to find for Plaintiff.

Accordingly, the Court DENIES Defendant's motion for judgment as a matter of law.

## III. MOTION FOR NEW TRIAL

### A. Standard for Motion for New Trial

A motion for new trial is governed by Federal Rule of Civil Procedure 59 ("Rule 59"), which provides in relevant part:

> A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

Fed.R.Civ.P. 59(a).

### 1. Against the Clear/Great Weight of the Evidence, Seriously Erroneous Result, or Miscarriage of Justice

The Ninth Circuit Court of Appeals has consistently held that a district court's finding that there is substantial evidence

---

5. The parties agreed to a jury instruction stating that:

> Any speech by the Plaintiff that did not occur very close in time before he was disciplined may not, by itself, support a finding that he was retaliated against for his speech. Temporal proximity of seven and a half months or so between the date Plaintiff claims to have expressed critical views about union leadership and/or union policies and his suspension and fine, together with other evidence of a retaliatory motive,

can provide circumstantial evidence of retaliation.
*See* Jury Instruction No. 12.

6. Even if there were some red herrings in the trial, as Defendant alleges, it is of no consequence to this Court's decision on the motion for judgment as a matter of law because the jury was presented with specific and substantial evidence of retaliation, from which a reasonable jury could have found in favor of Plaintiff. *See* Motion at 15.

to uphold the verdict on a motion for judgment as a matter of law will not necessarily prevent the Court from ordering a new trial. However, Ninth Circuit case law has been less consistent in articulating the circumstances that warrant a new trial, stating variously that district courts have discretion to grant Rule 59 motions when the verdict is "against the clear [or 'great'] weight of the evidence," when the evidence shows that the jury has reached a "seriously erroneous result," and/or when the evidence shows that acceptance of the verdict would cause a "miscarriage of justice." *See EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir.1997) (internal quotations and citations omitted) ("Although the court's ruling on an alternative motion for a new trial involves the exercise of some discretion, a stringent standard applies when the motion is based on insufficiency of the evidence. A motion will be granted on this ground only if the verdict is against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result."); *Roy v. Volkswagen of America*, 896 F.2d 1174, 1176 (9th Cir. 1990) ("The trial court may grant a new trial, even though the verdict is supported by substantial evidence, if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice.") (citing *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th Cir.1976)) (internal quotation omitted); *Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir.1987) ("If there is substantial evidence presented at trial to create an issue for the jury, a trial court may not grant a motion for a directed verdict or for judgment notwithstanding the verdict. The existence of substantial evidence does not, however, prevent the court from granting a motion for a new trial pursuant to Fed.R.Civ.P. 59 if the verdict is against the clear weight of the evidence.").

While the Court has discretion to assess the evidence within these frameworks ("against the clear weight of the evidence," "seriously erroneous result," "miscarriage of justice"), the standard for finding insufficient evidence warranting a new trial remains high. *See Roy,* 896 F.2d at 1176 ("While the trial court may weigh the evidence and credibility of the witnesses, the court is not justified in granting a new trial 'merely because it might have come to a different result from that reached by the jury.' ") (citing *Wilhelm v. Associated Container Transportation (Australia) Ltd.*, 648 F.2d 1197, 1198 (9th Cir.1981)).

In most cases, the judge should accept the findings of the jury; however, if the judge is left with the definite and firm conviction that a mistake has been committed, he may grant a new trial:

> On the one hand, the trial judge does not sit to approve miscarriages of justice. His power to set aside the verdict is supported by clear precedent at common law and, far from being a denigration or a usurpation of jury trial, has long been regarded as an integral part of trial by jury as we know it. On the other hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter .... If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial.

*Landes,* 833 F.2d at 1371–72 (internal quotation and citations omitted). "The judge can weigh evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Id.*

### 2. Harmless Error

Where a motion for new trial is based on allegations that the Court committed an error, the error must be harmful to warrant a new trial. Federal Rule of Civil Procedure 61 ("Rule 61") provides that the court should not grant a new trial, set aside a verdict, or modify a judgment unless refusal to do so would be inconsistent with substantial justice. Rule 61 states:

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

In other words, a new trial is not justified if an error was harmless. *See Glanzman v. Uniroyal, Inc.,* 892 F.2d 58, 61 (9th Cir.1989) ("If an error does 'not affect the substantial rights of the parties' it will be deemed 'harmless' and not grounds for reversal or appeal." This concept under Rule 61 applies at trial court and on appeal).

### 3. Remittitur

Where the trial court finds no evidence that passion or prejudice affected the jury's liability finding, but finds that the damage award is excessive, the court may order a remittitur as an appropriate method of reducing the excessive award. *See Snyder v. Freight, Construction, General Drivers, Warehousemen and Helpers, Local No. 287,* 175 F.3d 680, 689 (9th Cir. 1999) (amended by 817 F.2d 609) (quoting *Seymour v. Summa Vista Cinema, Inc.,*

809 F.2d 1385, 1387 (9th Cir.1987)) ("Where there is no evidence that passion and prejudice affected the liability finding, remittitur is an appropriate method of reducing an excessive verdict"); *see also Seymour,* 809 F.2d at 1387. Specifically, if after viewing the evidence concerning damages in a light most favorable to the prevailing party, the trial court determines that an award of damages is excessive, the trial court has two options. *See Fenner v. Dependable Trucking Co., Inc.,* 716 F.2d 598, 603 (9th Cir.1983). It may grant defendant's motion for a new trial or deny the motion conditional upon the prevailing party accepting a remittitur. *Id.; Snyder,* 175 F.3d at 689; *see also* 11 Charles A. Wright & Arthur R. Miller, Federal. Practice & Procedure § 2815, at 160 (2d ed.1995).

By setting a remittitur, the "prevailing party is given the option of either submitting to a new trial or of accepting a reduced amount of damage which the court considers justified." *Fenner,* 716 F.2d at 603. If the prevailing party does not consent to the reduced damages, a new trial must be granted. *Id.; see also* 11 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2815, at 159–171 (2d ed.1995) (court may order a complete new trial or a new trial on the issue of damages only). If the prevailing party accepts the remittitur, judgment must be entered in the lesser amount. *Fenner,* 716 F.2d at 603.

### B. Analysis of Motion for New Trial

■ In analyzing the motion for a new trial or reduction of the damages award, the Court will first examine the motion in the context of the jury's finding of liability and then in the context of the damages award.

#### 1. Analysis of ILWU Liability

Defendant asserts that the same arguments it raises for judgment as a matter of

law warrant the grant of a new trial. *See* Motion at 19. The Court disagrees. After weighing all of the evidence and assessing the credibility of the witnesses, the jury's finding of liability does not leave the Court with a definite or firm conviction that a mistake has been committed. The Court finds that the finding of liability was not against the clear weight of the evidence; it was not a seriously erroneous result and does not result in a miscarriage of justice.

Plaintiff presented credible evidence that ILWU retaliated against him as a direct result of his criticism of ILWU leadership and policies. The Court disagrees with Defendant's assertion that the evidence of motive is "extremely weak." *See* Motion at 19. Defendant's argument that "there was no evidence that plaintiff was any more vocal than others" is wrong. *See* Motion at 19. Mr. Biga credibly testified that no one else spoke out as much or as critically as Plaintiff. Even if Mr. Biga's testimony was not credible,[7] Defendant's argument is misleading because there was limited evidence about how much other ILWU members spoke out (whether more or less than Plaintiff) and/or the circumstances surrounding that speech.

Plaintiff and Defendant presented conflicting evidence about how "heated" the debates were between Plaintiff and Mr. Lapenia at the 1997 convention. The testimony by Defendant's witnesses, who tended to indicate that the debates were not very heated or out of the ordinary, could be somewhat discredited by the fact that most of the individuals testifying could have been biased and testifying in a manner to limit their own liability (in the case of Mr. Lapenia), seeking to defend the actions they took on behalf of the union or its leadership (for example, the members of the judicial panel who voted to suspend and fine Plaintiff, or Mr. Fujimura who was an ILWU leader when Plaintiff was suspended), or seeking to protect union leaders whom they support. Mr. Lapenia conceded that he and Plaintiff publicly disagreed over multiple issues, in front of an audience, at the 1997 convention. This evidence alone demonstrates that Mr. Lapenia and/or his co-leaders at ILWU could have been motivated to retaliate against Plaintiff for challenging the leadership's views and policies in public. Weighing all of the evidence and assessing credibility, the Court finds credible evidence that Plaintiff's criticisms of union leadership and policies at the 1997 convention motivated ILWU to retaliate against him.

Even if the public disagreements between Mr. Lapenia and Plaintiff were not as heated as Plaintiff's witnesses described, credible evidence was presented that Defendant was also motivated by the results of the November 1997 election to suspend Plaintiff, so that Plaintiff could not take a leadership position within the union and act on his criticisms.[8]

---

7. ILWU argues that Mr. Biga's testimony was completely discredited by his earlier deposition in which he stated that he attended the 1997 convention, even though on the witness stand at trial, he stated that he did not attend that convention. *See* Motion at 6–7. On the witness stand, Mr. Biga explained that he did not attend the 1997 convention, but was confused at his deposition about which conventions he did attend because he had attended other ILWU annual conventions. The Court finds Mr. Biga's explanation to be convincing and finds his testimony overall to be highly credible.

8. Although the jury's finding of no liability for Mr. Lapenia is not being challenged, the Court notes that finding does not conflict with the jury's finding of liability for ILWU. Plaintiff presented evidence that Mr. Lapenia, Mr. Girald, Mr. Fujimura, and Mr. Tacdol were all motivated to and did retaliate against him. The jury could have found that the evidence regarding Mr. Lapenia's retaliatory action was not strong enough to find him personally

Evidence that Plaintiff "is the only individual who has ever claimed that he was retaliated against for expressing disagreements with Union policies or leaders" does not, as Defendant asserts, demonstrate that the verdict is contrary to the weight of the evidence. *See* Motion at 20. The corollary fact is true as well: undisputed evidence indicates that Plaintiff was the only ILWU member ever prosecuted (or "persecuted," as Mr. Lapenia testified) under article II, section 1 of the constitution. In fact, the evidence that no other ILWU member has ever been prosecuted under article II, despite evidence that other members may have violated that section, supports Plaintiff's theory that ILWU retaliated against him for speaking out against union leadership and policies. Mr. Girald testified that as a result of Plaintiff's objections regarding Mr. Girald's investigation of Plaintiff's activities, he investigated whether other business agents were engaged in outside activities, but Mr. Girald's testimony on this subject is self-serving: he has an interest in defending his own decision to conduct an in-depth investigation into one business agent accused of engaging in outside activities but not to conduct an equally in-depth investigation into outside activities of other business agents who had also been accused. When taken as a whole, the evidence raises an inference that even if Plaintiff did violate the constitution, he would not have been investigated, charged, convicted, suspended and fined if he had not publicly criticized ILWU leadership and policies.[9]

Defendant ILWU argues also that a new trial on liability is warranted because many of the judicial panel members testified that they did not know of Plaintiff's speech, and all of the panel members testified both that they believed Plaintiff violated the constitution and that they did not act to retaliate against him.[10] *See* Motion at 19–21. The testimony of the judicial panel members, however, was severely discredited by evidence that the panel suspended Plaintiff for one year based on a null and void permit application. Specifically, the panel suspended Plaintiff for a total of nine years because they found that he violated the constitution nine times (by applying for nine electrical permits). However, one of those nine permit applications is clearly marked null and void, in a manner that is immediately apparent to anyone who glances at that permit application. In addition to suspending Plaintiff for one year based on the null and void permit application, the panel suspended him for a year based on the application that superceded the null and void application. The judicial panel members could not explain why Plaintiff was suspended for a null and void permit application.[11]

---

liable, while finding that evidence of the leadership's actions (collectively or individually among the other officers) was sufficiently strong and credible to find ILWU liable.

9. The Court is not persuaded by ILWU's argument that the judicial panel's failure to convict Plaintiff of violating the financial code demonstrates that the action taken against Plaintiff was not retaliatory. *See* Reply at 9. Those acting to retaliate against Plaintiff would have known that a conviction under the financial code count was not necessary to find Plaintiff guilty of violating the constitution and to suspend and fine him.

10. Conversely, Plaintiff presented some evidence that certain ILWU members who signed the charges against Plaintiff or participated in the judicial panel were aware of Plaintiff's criticism of the ILWU leadership and policies, and that certain of them were supporters of Mr. Lapenia and/or the ILWU leadership.

11. For example, Mr. Bajo–Daniel testified that he must have overlooked the fact that one permit was null and void, despite the fact that it was clearly so marked.

The impartiality of the ILWU trial and appeal process (and credibility of the witnesses at this trial from the judicial panel and appeal board) was also discredited by Mr. Galdones's testimony that the appeals board essentially rubber stamped the judicial panel's decision and order without undertaking a complete or impartial review.

In sum, after weighing all of the evidence presented at trial and assessing its credibility, the Court finds that there is substantial credible evidence that Plaintiff exercised the right to oppose union leadership and/or union policies, was subjected to retaliatory action, and that retaliatory action was a direct result of his decision to express disagreement with the union's leadership and/or union policies. The verdict finding ILWU liable is not against the clear weight of the evidence or clearly erroneous. The Court is not left with a definite or firm conviction that a mistake has been committed by the jury in its finding of liability.

### 2. Analysis of Damages Award

The Court will address first the compensatory damages award of $240,000, and second the punitive damages award of $1 million dollars.

### a. Compensatory Damages

■ In this action, Plaintiff seeks compensatory damages for injury to reputation and emotional distress. The jury awarded Plaintiff $90,000 for injury to reputation and $150,000 for emotional distress.

To obtain compensatory damages in an LMRDA case in the Ninth Circuit, a plaintiff must prove that he suffered an "actual injury" due to the defendant's conduct. *See Bise v. International Bhd. Elec. Workers, Local 1969*, 618 F.2d 1299, 1305 (9th Cir.1979). The jury was instructed that actual injuries in this case may include any injury to Plaintiff's reputation, and emotional distress as evidenced by physical manifestations of lost sleep, headaches, heart palpitations, and increase in weight. *See Bise*, 618 F.2d at 1305; *see also Snyder v. Freight, Construction, General Drivers, Warehousemen and Helpers, Local No. 287*, 175 F.3d 680, 684–685 (9th Cir.1999).[12]

Plaintiff credibly testified at length about his injuries. Plaintiff testified that his reputation was injured by the stigma that went along with being found guilty of violating the constitution, suspended from membership, fined, and removed from his position as a business agent. Plaintiff tes-

**12.** Defendant agreed to the following jury instruction regarding compensatory damages:

In determining the measure of damages, you should determine whether the Plaintiff has proven by a preponderance of the evidence that he suffered an actual injury due to the Defendants' unlawful conduct. Actual injuries include any injury to reputation, and emotional distress as evidenced by physical manifestations such as lost sleep, headaches, heart palpitations, and increase in weight.

*See* Jury Instruction No. 16 (excerpt).

Defendant also agreed to an instruction that Plaintiff is not seeking lost wages:

Plaintiff is not seeking to recover any lost wages in this action, and you may not include any amount for lost wages in your computation of damages. However, you may consider whether Plaintiff's loss of wages, if any, caused him to suffer any emotional distress. In determining whether Plaintiff is entitled to any punitive damages, you may consider lost wages, if any, to the extent they reflect actual harm inflicted on Plaintiff.

*See* Jury Instruction No. 18.

Defendant did not specifically object to either of these instructions; therefore, the Court will not entertain Defendant's post-trial objections to the instructions. *See* Fed. R.Civ.P. 51; *McGonigle v. Combs*, 968 F.2d 810, 823 (9th Cir.1992). *See also* Transcript of Further Settling of Jury Instructions at 5, 11–15 (agreeing to all jury instructions but expressing concern over Court's pretrial ruling with respect to the operation of Title IV preemption).

tified that he was forced to go back to working at the sugar mill (where he worked prior to becoming a business agent) and lost his reputation of being someone who held power in the community.

■ Plaintiff also testified that he suffered emotional distress as a result of the suspension and fine. He testified that as a result of the suspension and fine, he: was ashamed and embarrassed and seldom attended social functions; lived in fear of retribution for the litigation; felt unhappy about having to miss time with his children while working a second job to make up for income lost as a result of his suspension and about his inability to send his son to college or his daughter to design school; lost sleep; lost his sexual appetite; aggravated his high blood pressure; and gained weight.[13]

After weighing all of the evidence, the Court finds that the compensatory damages award is supported by substantial credible testimony, and not the result of guesswork or conjecture. The award is not against the clear weight of the evidence and does not create a miscarriage of justice or seriously erroneous result. Al-

though the Court may not have chosen to award equally high compensatory damages if it were acting as the fact finder, the jury's compensatory damages award does not leave the Court with a conviction that a mistake has been made.

### b. Punitive Damages

■ The jury awarded one million dollars in punitive damages against ILWU. Punitive damages are available in an LMRDA case in the Ninth Circuit to a plaintiff who establishes actual malice or reckless or wanton indifference to plaintiff's rights. *See Bise*, 618 F.2d at 1305–1306.[14] Specifically, the Ninth Circuit Court of Appeals has upheld the awarding of punitive damages under the LMRDA to protect the individual rights of union members and to deter abuse and denial thereof by union officers. *Id.* at 1305 n. 6.

In reviewing the instant punitive damages award against ILWU, the Court is mindful of the unique nature of punitive damage awards against unions, as expressed by the U.S. Supreme Court, which has cautioned that punitive damages against unions should not "compromise[ ] the collective interests of union members

13. Although Defendant did not object at trial, it now objects to Plaintiff's testimony that he suffered from sleep apnea as a result of ILWU's retaliation. *See* Motion at 23. Defendant cites a decision from the Eastern District of Pennsylvania, which holds that without expert testimony regarding a specific diagnosis of a complex mental ailment, the plaintiff may testify as to his symptoms and injuries but not the cause or diagnosis. *See Ferris v. Pennsylvania Federation Brotherhood of Maintenance of Way Employees*, 153 F.Supp.2d 736, 746 (E.D.Pa.2001). The Court finds that any error in permitting Plaintiff to state that he developed sleep apnea was harmless error. Plaintiff testified at length regarding his injuries and symptoms, including his loss of sleep, and the statement regarding sleep apnea was only one very small part of the detailed testimony. The

testimony did not violate Defendant's substantial rights or rise to the level of plain error. *See Hemmings v. Tidyman's Inc.*, 285 F.3d 1174 (9th Cir.2002) (applying plain error review to non-contemporaneous trial objections).

14. Defendant argues that Ninth Circuit precedent is incorrect to permit punitive damages against unions in LMRDA cases. This Court, however, is bound by the Ninth Circuit precedent in *Bise*, which held that punitive damages are available under the LMRDA. *See Bise*, 618 F.2d at 1305–1306. Moreover, to the extent Defendant now challenges the jury instruction on punitive damages to which it previously agreed, this Court finds that Defendant waived its objection. *See* Fed.R.Civ.P. 51; *see also McGonigle v. Combs*, 968 F.2d 810, 823 (9th Cir.1992).

in protecting limited funds." *International Brotherhood of Electrical Workers v. Foust*, 442 U.S. 42, 50, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979) (holding punitive damages unavailable against union for breach of duty of fair representation but taking no position on availability of punitive damages against union for violation of LMRDA). The Supreme Court has also cautioned that large punitive damage awards "could deplete union treasuries, thereby impairing the effectiveness of unions as collective-bargaining agents." *Id.* at 50–51, 99 S.Ct. 2121.

A grossly excessive punitive damage award furthers no legitimate purpose and constitutes an arbitrary deprivation of property, violating the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution. *See State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 416–417, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). *See also Bains LLC v. Arco Products Co.*, 405 F.3d 764, 774–777 (9th Cir.2005) (excessive punitive damages award for violation of federal statute is inconsistent with due process, pursuant to the standards set forth in *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)). This Court looks to three guideposts in reviewing the one million dollar award of punitive damages against ILWU: (1) the degree of reprehensibility of the Defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the Plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *See Campbell*, 538 U.S. at 418, 123 S.Ct. 1513; *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574–575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *Bains LLC*, 405 F.3d at 775.

### 1) Degree of Reprehensibility

The degree of reprehensibility of the Defendant's misconduct is "the most important indicium of the reasonableness of a punitive damages award." *See Campbell*, 538 U.S. at 419, 123 S.Ct. 1513; *Gore*, 517 U.S. at 575, 116 S.Ct. 1589. In determining the reprehensibility, the Court considers whether:

the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Campbell*, 538 U.S. at 419, 123 S.Ct. 1513. "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id.*

Applying these factors in the instant case, the Court finds only a moderate degree of reprehensibility in ILWU's conduct. The harm was not physical, the conduct did not evince a disregard for the health or safety of others, the target (Plaintiff) was not particularly vulnerable financially, and the conduct appears to have been somewhat of an isolated incident in that little, if any, evidence was introduced that ILWU previously retaliated against Plaintiff or anyone else for speaking out. These factors all weigh against a finding of high reprehensibility, but the sole remaining factor weighs in the opposite direction.

There was evidence, and the jury found, that ILWU acted with actual malice or reckless or wanton indifference to Plaintiff's rights. Specifically, ILWU acted with reckless indifference to Plaintiff's free

speech rights. As Mr. Biga testified, Plaintiff "ruffled the feathers" of ILWU leadership by criticizing the leadership and its policies; the leadership did not stand for Plaintiff's repeated criticisms and eventually acted to retaliate against Plaintiff with absolutely no regard for Plaintiff's statutory right to voice his opinions. Thus, considering all of the evidence, the Court finds that ILWU acted with a moderate degree of reprehensibility. ILWU's conduct, after having paid compensatory damages, is reprehensible enough to warrant the imposition of some amount of additional sanctions to achieve punishment and deterrence; however, the Court is not persuaded that ILWU's conduct was sufficiently reprehensible to warrant imposition of a one million dollar punitive damages award. *See Gore,* 517 U.S. at 580, 116 S.Ct. 1589.

### 2) Ratio

The Court "must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Campbell,* 538 U.S. at 426, 123 S.Ct. 1513. The U.S. Supreme Court has declined to adopt a bright-line ratio which a punitive damage award cannot exceed, instead instructing that exemplary damages must "bear a 'reasonable relationship' to compensatory damages." *Gore,* 517 U.S. at 580, 116 S.Ct. 1589. In the instant case, the ratio of punitive to compensatory damages is approximately 4:1. A single-digit multiplier, like this multiplier of four, is "more likely to comport with due process" than awards with double and triple digit multipliers. *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513. However, "[w]hen compensatory damages are substantial," as they are here, "then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513.

Where a compensatory damages award is based on emotional distress damages caused by humiliation and outrage, it likely contains a punitive element of punishment in addition to an element of compensation. *See Campbell,* 538 U.S. at 426, 123 S.Ct. 1513. In the instant case, a strong likelihood exists that the compensatory and punitive damages are based in part on duplicative considerations because much of Plaintiff's emotional distress (for which he was awarded $150,000 in compensatory damages) was caused by the outrage and humiliation he suffered as a result Defendant's conduct, and a major role of punitive damages is to condemn such conduct. *Id.* In light of the substantial compensatory damages awarded and the duplicative considerations in the compensatory and punitive awards, the Court finds that the punitive damages award of one million dollars is excessive.

### 3) Sanctions for Comparable Misconduct

"Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." *Gore,* 517 U.S. at 583, 116 S.Ct. 1589. For example, although the LMRDA does not set a maximum penalty for violation of a member's free speech rights, the LMRDA sets maximum penalties for other (unrelated) violations of the statute, none of which are above $10,000. *See, e.g.,* 29 U.S.C. §§ 411, 461, 463, 501. In the context of retaliatory action by an employer under Title VII of the Civil Rights Act of 1964, which the Ninth Circuit Court of Appeals has likened to retaliatory action under the LMRDA, Congress has set the maximum damages (for compensatory and punitive damages combined) at $300,000 for an employer with over 500 employees. *See* 42 U.S.C. § 1981a(b)(3).

Criminal fines are particularly instructive "because punitive damages are quasi-criminal." *See In re Exxon Valdez*, 270 F.3d 1215, 1245 (9th Cir.2001). The maximum criminal penalty under federal law that may be imposed upon an organization is $200,000, unless a substantive statute provides otherwise, for a Class A misdemeanor not resulting in death. *See* 18 U.S.C. § 3571(c)(5). *See also Jacobs v. Local Union 48*, 2002 WL 31470405 (D.Or. 2002) (finding Title VII and criminal maximum penalties instructive in reducing punitive damages award under LMRDA from $300,000 to $200,000).

An examination of punitive damage awards in comparative LMRDA cases is equally instructive. This Court is not aware of, and the parties have not cited, any LMRDA case where a court upheld a punitive damage award of more than $500,000 against a union. *See Bender v. Wholesale & Retail Food Distribution Teamsters Local 63*, 1988 WL 285579 (C.D.Cal.1988) (finding $500,000 punitive damages award was not excessive). The one case that upheld a $500,000 punitive damages award involved serious physical torts, which are not present in the instant case. *Id.*, 1988 WL 285579 at *2.

In factual scenarios comparable to the instant case, plaintiffs have been awarded less punitive damages. For example, where a union member was retaliated against and expelled from membership for exercising his union rights (including his free speech rights), the Seventh Circuit Court of Appeals affirmed a $150,000 punitive damages award. *See Kinslow v. American Postal Workers Union, Chicago Local*, 222 F.3d 269, 273, 278–279 (7th Cir.2000) (affirming punitive damages, injunctive relief and attorneys' fees but vacating and remanding $40,000 award of overtime pay for more specific findings). Where a union member was terminated from his position as a business representa-

tive and had his membership withdrawn for speaking against union leaders, the Sixth Circuit Court of Appeals affirmed a punitive damage award of $100,000. *See Thompson v. Office and Professional Employees Int'l Union, AFL–CIO*, 74 F.3d 1492, 1500, 1509 (6th Cir.1996) (affirming award of $100,000 in compensatory damages, $1 in damages for expulsion, and $100,000 in punitive damages against union). Where a union member was disciplined for exercising his free speech rights, the Second Circuit Court of Appeals reduced the punitive damage award against the union from $50,000 to $10,000. *See Petramale v. Local No. 17 of Laborers' Int'l Union of North America*, 847 F.2d 1009, 1011, 1013–1014 (2d Cir.1988) (reducing compensatory damages from $200,000 to $100,000, reinstating jury verdict of $5,000 punitive damages against each individual defendant, and reducing punitive damage award against union from $50,000 to $10,000).

In sum, comparable civil and criminal penalties, including punitive damage awards in similar LMRDA cases, are far less than the one million dollar punitive damage award in the instant case. This comparison indicates an excessiveness in the one million dollar award.

### 4) Remittitur of Punitive Damages

Application of the *Gore* guideposts to the facts in this case, especially in light of the substantial compensatory damages award for injury to reputation and emotional distress (a portion of which contained a punitive element) and the comparative awards in civil and criminal contexts, leads this Court to find that the one million dollar punitive damages award is grossly excessive. Considering all of the evidence in this case, the Court concludes that the punitive damages award should be reduced to $240,000. This reduced amount

adequately vindicates the invasion of Plaintiff's rights and deters future violations by overzealous unions and their officers. *See Bise*, 618 F.2d 1299, 1305–1306. Thus, the Court grants ILWU's motion for a new trial on the issue of punitive damages unless, within twenty days from the date of this order, Plaintiff agrees to remit all punitive damages in excess of $240,000.[15] If Plaintiff chooses not to remit the excess punitive damages, the Court orders a new trial on the issue of punitive damages. *See Fenner v. Dependable Trucking Co., Inc.*, 716 F.2d 598, 603 (9th Cir.1983) (by setting a remittitur, the "prevailing party is given the option of either submitting to a new trial or of accepting a reduced amount of damage which the court considers justified"); *see also Petramale*, 847 F.2d at 1014 (remanding for new trial on punitive damages unless plaintiff agrees to remit all punitive damages in excess of $10,000).

### CONCLUSION

In summary, the Court takes the following actions.

(1) The Court denies Defendant ILWU's motion for judgment as a matter of law because, in drawing all reasonable inferences in Plaintiff's favor and not assessing the credibility of the witnesses, the Court finds that there is a legally sufficient basis for a reasonable jury to find in favor of Plaintiff and the jury verdict is supported by specific and substantial evidence.

(2) The Court denies Defendant ILWU's motion for a new trial as it applies to the finding of liability. After weighing all of the evidence and assessing its credibility, the Court finds that there is substantial, credible evidence that Plaintiff exercised the right to oppose union leadership and/or union policies, was subjected to retaliatory action, and that retaliatory action was a direct result of his decision to express disagreement with the union's leadership and/or union policies. The verdict finding ILWU liable is not against the clear weight of the evidence or clearly erroneous.

(3) The Court denies Defendant ILWU's motion for a new trial as it applies to the issue of compensatory damages. After weighing all of the evidence and assessing its credibility, the Court finds that the compensatory damages award is supported by substantial credible testimony, and is not against the clear weight of the evidence or clearly erroneous.

(4) The Court grants Defendant ILWU's motion for a new trial on the issue of punitive damages unless, within twenty days from the date of this order, Plaintiff agrees to remit all punitive damages in excess of $240,000 (thereby reducing Plaintiff's total award to $480,000, consisting of $240,000 in compensatory damages plus $240,000 in punitive damages). The one million dollar punitive damages award is grossly excessive, unreasonable, and disproportionate to the wrong committed.

IT IS SO ORDERED.

---

**15.** If Plaintiff agrees to remit the excess, Plaintiff's total damage award would equal $480,000 (consisting of $240,000 in compensatory damages plus $240,000 in punitive damages).